UNITED STATES of America,
Plaintiff–Appellee,

v.

Douglas Lee DUNFORD, Sr.,
Defendant–Appellant.

No. 96–4890.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 30, 1998.

Decided July 2, 1998.

**ARGUED:** Louis Dene, Abingdon, Virginia, for Appellant. Steven Randall Ramseyer, Assistant United States Attorney, Abingdon, Virginia, for Appellee. **ON BRIEF:** Pamela Meade Sargent, White; Bundy, McElroy, Hodges & Sargent, Abingdon, Virginia, for Appellant. Robert P. Crouch, Jr., United States Attorney, Abingdon, Virginia, for Appellee.

Before MURNAGHAN, NIEMEYER, and MOTZ, Circuit Judges.

Affirmed in part, reversed in part, and remanded by published opinion. Judge NIEMEYER wrote the opinion, in which Judge MURNAGHAN and Judge DIANA GRIBBON MOTZ joined.

## OPINION

NIEMEYER, Circuit Judge:

Douglas Lee Dunford was convicted on fourteen counts for the illegal possession of six firearms and ammunition seized from his house on October 4, 1995. The fourteen counts included one count for each firearm and one for the ammunition based on Dunford's status as a convicted felon and one count each for the same firearms and ammunition based on Dunford's status as a drug user. Dunford's convictions were obtained in large part from hearsay testimony about what his daughters had previously told state officials but had recanted at trial. On appeal, Dunford contends that he should have been convicted at most of only one count of illegal possession and that, even then, the district court erred in (1) declining to recognize a parent-child testimonial privilege; (2) admitting, under Federal Rule of Evidence 803(24), hearsay testimony of what his daughters said; and (3) permitting the government to call his daughters at trial for the purpose of impeaching them. He also challenges other evidentiary rulings and the sufficiency of the evidence.

For the reasons that follow, we affirm in part, reverse in part, and remand for resentencing.

## I

Responding to a complaint that Dunford was physically abusing his children, officers of the Wythe County, Virginia, Sheriff's Department served Dunford with a felony warrant at his house on October 4, 1995. After officers advised Dunford of their reason for being at his house, Dunford reached into his pocket and handed a small bag of marijuana to his brother, Bradley. Based on that transaction and their observation of other evidence of illegal drugs, the officers obtained a warrant that same day to search Dunford's house.

From the search of the house, the officers recovered marijuana, unidentified pills, scales, smoking devices, six firearms, and ammunition. Two rifles and three shotguns were found between the mattress and box spring in Dunford's son's bedroom where Bradley often slept. An ammunition clip with four rounds was found on top of the bed. Another rifle was found between the mattress and box spring of a bed used by Dunford's daughter, Ashley. Finally, five rounds of ammunition were found in a bowl on the dresser in Dunford's own bedroom. Officers also recovered a picture from Dunford's house of a skeleton with a gun which read, "I'll give my gun up when they pry it from my cold dead fingers."

Dunford was indicted on fourteen counts of firearms offenses—seven for violation of 18 U.S.C. § 922(g)(1) (prohibiting possession of a firearm or ammunition by a convicted felon) and seven for violation of 18 U.S.C. § 922(g)(3) (prohibiting possession of a firearm or ammunition by an illegal drug user).

At trial, Dunford acknowledged by stipulation that he was disqualified from possessing a firearm both because he was a convicted felon and because he was an illegal drug user. He presented the testimony of his brother Bradley, however, that the four rifles and two shotguns belonged to Bradley and that Dunford did not even know that Bradley had hidden them in Dunford's house, where Bradley often stayed. The government presented evidence that Dunford's two daughters, Kia and Ashley, had, prior to the trial, complained to two different social services officials, a police officer, and the assistant principal at their high school about Dunford's physical abuse of them, which included threats with a gun.

Kim Church, a social worker who had responded to a child protective services complaint at Dunford's home, testified that Kia told her that Dunford had placed a gun to Ashley's head, threatening to kill her, and that he then placed the gun to his own head, threatening to kill himself. According to Church, Kia told her that this incident was

witnessed by Dunford's mother and sister. Church also recalled that Kia told her that Dunford had come to her school and "told her to get her f——king ass into the car and smacked her in the face [and] held a knife to her neck." Kia also discussed with Church an incident which had occurred a few days earlier in which her father had "gotten drunk, slapped her in the face, pulled her hair, kicked her in the ribs, [and] hit her eye causing a bruise." Church observed a swollen bruise on Kia's face consistent with her story. Church noted that since her conversation with Kia, Kia had denied making the statement of her father's gun possession and child abuse and claimed that the conversation had never occurred.

Officer Keith Dunaghan also recalled both Kia and Ashley telling him that their father had placed a gun to Ashley's head and threatened to kill her and had also threatened to kill himself.

Terry Lockhart, the assistant principal at Kia's high school, testified that he recalled that Kia had told her that her father "had a gun, was threatening to commit suicide, had shot the gun in the home, and the girls were very scared that evening." Lockhart also observed a bruise around Kia's eye and had been told by Kia that her father had been beating her.

Finally, Patricia Rigney, the Wythe County Child Protective Services Coordinator, testified to a conversation with Ashley in which Ashley had "talked about an incident in which her dad had placed a shotgun with a long scope to her head, and said he was going to kill her, and then pulled it down.... In that same evening an incident occurred where he was outside with his mother and his aunt, Rachel Moore, and he placed the gun to his mouth and said he was going to kill himself." Rigney had not spoken with Kia at this time and was unaware of Kia's version of these events.

Both Kia and Ashley, subpoenaed to testify at trial by the government, denied the events related in the pretrial statements attributed to them and denied making the statements. Similarly, Dunford's mother and sister denied witnessing the incidents which they allegedly saw.

The jury convicted Dunford on all fourteen counts, and the court sentenced him to 63 months imprisonment on each count with sentences to run concurrently. This appeal followed.

## II

Based on the six guns and the ammunition seized on October 4, 1995, from Dunford's house, Dunford was indicted and convicted on fourteen firearms counts, seven under 18 U.S.C. § 922(g)(1) (prohibiting possession of a firearm or ammunition *by a convicted felon*) and seven under § 922(g)(3) (prohibiting possession of a firearm or ammunition *by an illegal drug user*). Contending that he should have been charged and convicted on only one firearms count, Dunford argues that (1) a person in possession of a firearm who is both a felon and a drug user does not violate the statute more than once for each act of possession, and that (2) his possession of all six firearms and the ammunition constituted only one act of possession within the meaning of the statute. He contends that his conviction on fourteen separate counts is unconstitutionally duplicative. We find his arguments persuasive.

Section 922(g) of Title 18 makes it unlawful for a person in one of nine specified classes to possess a firearm or ammunition. Thus, the statute prohibits firearm possession by, for example, convicted felons, fugitives, unlawful users of drugs, adjudicated "mental defectives," and illegal aliens. While the prohibited conduct is the possessing of any firearm or ammunition, the statute applies only to members of classes specified in the statute.

Dunford is a member of at least two of the disqualifying classes, being a convicted felon and an illegal drug user. *See* § 922(g)(1) & (3). He argues, however, that whether he is a member of one of the disqualifying classes or of all nine, a single act of possession can only constitute a single offense. We agree.

The nine classes of people barred from firearm possession by § 922(g) are those classes which consist of persons, who by reason of their status, Congress considered too

dangerous to possess guns. But we see nothing in the statute which suggests that Congress sought to punish persons by reason of their legal status alone. If we were to interpret the statute to establish separate offenses for each separate status, we would, in effect, be criminalizing the status itself.

■ Thus, we hold that while a person must be a member of at least one of the nine classes prohibited from possessing guns under § 922(g), a person who is disqualified because of membership in multiple classes does not thereby commit separate and multiple offenses. The offense is determined by performance of the prohibited conduct, *i.e.*, the possessing of a firearm or ammunition. In so holding, we join the other courts that have reached a similar conclusion. *See United States v. Johnson,* 130 F.3d 1420, 1425–26 (10th Cir.1997), *petition for cert. filed* (April 1, 1998) (No. 97–8558); *United States v. Munoz–Romo,* 989 F.2d 757, 759–60 (5th Cir. 1993); *United States v. Winchester,* 916 F.2d 601, 605–08 (11th Cir.1990); *but cf. United States v. Peterson,* 867 F.2d 1110, 1115 (8th Cir.1989) (convictions under §§ 922(g)(1) and (g)(3) for same act of possession did not violate the Double Jeopardy Clause), *abrogated on other grounds, Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).

Our holding that a person who is a member of more than one disqualifying class only violates § 922(g) once for each act of "possession," thereby reduces, at the least, Dunford's number of convictions from fourteen to seven. Dunford argues further, however, that he did not perform seven acts of possession, but rather one, which was a "simultaneous possession of six different firearms and ammunition."

To resolve Dunford's argument and determine what constitutes an offense under § 922(g), we must begin with the language of the statute itself. "The 'first criterion in the interpretive hierarchy [is] a natural reading of the full text.'" *See Norfolk Southern Corp. v. Commissioner,* 140 F.3d 240, 244 (4th Cir.1998) (quoting *United States v. Wells,* 519 U.S. 482, 117 S.Ct. 921, 927, 137 L.Ed.2d 107 (1997)). Section 922(g) makes it unlawful for any member of a disqualified class "to ... possess ... *any firearm or ammunition.*" 18 U.S.C. § 922(g) (emphasis added). This language presents the recurring question of "[w]hat Congress has made the allowable unit of prosecution." *Bell v. United States,* 349 U.S. 81, 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955) (quoting *United States v. Universal C.I.T. Credit Corp.,* 344 U.S. 218, 221, 73 S.Ct. 227, 97 L.Ed. 260 (1952)). The prohibited conduct—possession of any firearm or ammunition—could arguably occur every time a disqualified person picks up a firearm even though it is the same firearm or every time that person picks up a different firearm. The language does not delineate whether possession of two firearms—say two six-shooters in a holster—constitutes one or two violations, whether the possession of a firearm loaded with one bullet constitutes one or two violations, or whether possession of a six-shooter loaded with six bullets constitutes one or two or seven violations.

A similar problem was presented in *Bell* where the defendant was charged with two counts of violating the Mann Act, which prohibits the interstate transportation of "any woman or girl" for immoral purposes. 18 U.S.C. § 2421. The defendant concededly transported two women on the same trip and in the same vehicle. The Supreme Court recognized that Congress could well have made the "simultaneous transportation of more than one woman" a violation, 349 U.S. at 82, 75 S.Ct. 620, but because of the ambiguity in the statute, it resolved the doubt in favor of finding one offense, *id.* at 84, 75 S.Ct. 620.

■ Through a literal construction of the statute, we could conclude that when "any" is used in context of the singular noun "firearm," "any" means a single firearm. Through the same analysis, we could also conclude that "ammunition" is collective so that several rounds possessed at the one time constitutes a single offense. Under this literal interpretation, Dunford would have committed seven offenses, one for each firearm and one for the ammunition. But this literal interpretation would also require that each possession of a firearm constituted an offense, requiring a construction that defines the beginning and ending. It might require

ammunition located in different rooms of Dunford's house to be separate offenses and different calibers of ammunition to support a finding of different offenses. The Supreme Court has cautioned, however, that the question of what constitutes the allowable unit of prosecution "cannot be answered merely by a literal reading" of the statute. *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221, 73 S.Ct. 227, 97 L.Ed. 260 (1952) (examining the allowable unit of prosecution for record-keeping violations under the Fair Labor Standards Act). Moreover, when such ambiguity exists, we are instructed that such "ambiguity should be resolved in favor of lenity." *Bell*, 349 U.S. at 83, 75 S.Ct. 620. This lenity does not arise from any sympathy for the defendant who has committed a crime; "[i]t merely means that if Congress does not fix the punishment for a federal offense clearly and without ambiguity, doubt will be resolved against turning a single transaction into multiple offenses." *Id.* at 84, 75 S.Ct. 620.

We applied these principles in *United States v. Mason*, 611 F.2d 49, 52–53 (4th Cir.1979), to hold that defendant, who had purchased multiple firearms in one transaction and had misrepresented his qualification to possess those firearms on separate information forms submitted for each firearm, could not be convicted of separate offenses for making false statements in connection with each firearm. Similarly, in *United States v. Mullins*, 698 F.2d 686 (4th Cir. 1983), while we held that multiple possession of firearms at different times were separate offenses under 18 U.S.C. § 1202(a), a now-repealed statutory ancestor of § 922(g), we stated the rule that "when a convicted felon acquires two or more firearms in one transaction and stores and possesses them together, he commits only one offense under § 1202(a)(1)." *Id.* at 687.

We will apply the rule stated in *Mullins* to hold now that Dunford's possession of the six firearms and ammunition, seized at the same time from his house, supports only one con-

viction of 18 U.S.C. § 922(g). In so holding, we join the majority of circuits which have reached a similar conclusion. *See, e.g., United States v. Keen*, 104 F.3d 1111, 1119 (9th Cir.1996); *United States v. Hutching*, 75 F.3d 1453, 1459 (10th Cir.1996) ("The simultaneous possession of multiple firearms generally constitutes only . . . one offense unless there is evidence that the weapons were stored in different places or acquired at different times." (quotations omitted)); *United States v. Berry*, 977 F.2d 915, 917 (5th Cir. 1992); *United States v. Throneburg*, 921 F.2d 654 (6th Cir.1990); *United States v. Grinkiewicz*, 873 F.2d 253, 255 (11th Cir.1989).

Accordingly, we affirm one conviction of 18 U.S.C. § 922(g) and reverse thirteen. Because Dunford was sentenced on the basis of fourteen counts and thus directed to pay a $50 special assessment for each count, we vacate his sentence and remand this case for resentencing.[1]

### III

■ Dunford next contends that by allowing his daughters to testify against him, the district court erred by violating his parent-child testimonial privilege.

Federal Rule of Evidence 501 provides that privileges in federal court are to be "governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." The stated intent of this rule, as articulated by the Advisory Committee Notes, is that a federally developed common law of privileges be developed "on a case-by-case basis" for all criminal cases and for civil cases under federal law. This is confirmed in the legislative history. *See Jaffee v. Redmond*, 518 U.S. 1, 8, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996) (citing to S.Rep. No. 93–1277, p. 13 (1974), U.S. Code Cong. & Admin. News at 7051, 7059). As the Court in *Jaffee* observed, "The Rule thus did not freeze the law governing the privileges of witnesses in federal trials at a particular

---

1. We note that Dunford has not alleged that the multiplicity of his counts is fatal to the indictment or that he was prejudiced by his indictment for fourteen counts when he could, as a matter of law, be convicted of only one. *Cf. Johnson*, 130

F.3d at 1426 (concluding that counts charging multiplicitous violations of § 922(g)(1) & (3) for the same act of possession were not fatal to the indictment where evidence of guilt on both counts was equally "overwhelming").

point in our history, but rather directed federal courts to continue the evolutionary development of testimonial privileges." *Id.* at 8–9, 116 S.Ct. 1923 (internal quotation marks omitted).

Dunford urges that we adopt a parent-child privilege and reverse his conviction or vacate and remand the case for a new trial, directing the district court to apply the privilege and thereby prohibit the government from again calling his daughters to testify against him. He argues that the government's interests in presenting all of the evidence does not outweigh "an individual's right to privacy for communications in the family unit or the individual's right to the integrity and inviolability of the family relationship itself." He points out the difficult reality that his daughters were faced with "either confirming the Government's charges against their father, resulting in a certain prison term, or denying the charges and facing the Government's planned impeachment of them both before the jury."

■ We begin any discussion of privilege with a recognition of the presumptive principle that there is a "general duty" to give testimony because "the public . . . has a right to every man's evidence." *Jaffee,* 518 U.S. at 9, 116 S.Ct. 1923 (citations and internal quotation marks omitted). Privileges not to testify therefore must be "strictly construed." *Trammel v. United States,* 445 U.S. 40, 50, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980). They may be recognized "only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Id.* (quoting *Elkins v. United States,* 364 U.S. 206, 234, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) (Frankfurter, J., dissenting)); *see also Jaffee* 518 U.S. at 9, 116 S.Ct. 1923.

There may be much to commend a testimonial privilege in connection with the testimony of or against a minor child to preserve the family unit which is so much under stress in today's society. The tangible and intangible benefits of keeping families intact often seem to be forgotten in today's willingness to enact laws that readily authorize the fracture of the family or that provide incentives for doing so. In *Trammel,* the Court observed that casting aside a privilege that affects "marriage, home, and family relationships— already subject to much erosion in our day— . . . counsels caution." 445 U.S. at 48, 100 S.Ct. 906. But even if such a privilege were to be recognized, it would have to be narrowly defined and would have obvious limits, perhaps such as where the family fractures itself or the child waives the privilege or where ongoing criminal activity would be shielded by assertion of the privilege. Thus, the Supreme Court has noted, in connection with a similar limitation to the deep-rooted attorney-client privilege, "A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told." *Clark v. United States,* 289 U.S. 1, 15, 53 S.Ct. 465, 77 L.Ed. 993 (1933).

This circuit has never recognized a parent-child testimonial privilege. In *United States v. Jones,* 683 F.2d 817 (4th Cir.1982), we held narrowly that an *adult* child called before a grand jury could not assert a claim of privilege to avoid giving out adverse testimony against his father. But we did state:

> [W]e do not endeavor to decide to what extent the age of the child and whether or not emancipation has occurred may or may not affect the decision as to whether any familial privilege exists.

*Id.* at 819. The Third Circuit, in *In re Grand Jury,* 103 F.3d 1140, 1146 (3d Cir. 1997), *cert. denied,* —— U.S. ——, 117 S.Ct. 2412, 138 L.Ed:2d 177 (1997), has recently noted that "no federal Court of Appeals and no state supreme court has [yet] recognized such a privilege." *But see In re Agosto,* 553 F.Supp. 1298, 1325 (D.Nev.1983) (recognizing parent-child privilege). This case does not present the circumstances through which to address whether to recognize a parent-child testimonial privilege for minor children. Dunford was charged with illegally possessing guns in circumstances where he was abusing his children and placing them at risk with those guns. This is not the beneficial family unit that history has celebrated, and this is not the relationship which Dunford argues in principle should remain protected.

## IV

■ Dunford argues in any event that the pretrial statements attributed to his daughters were inadmissible hearsay. Before trial and during the course of the events leading to Dunford's arrest, his two daughters, Kia and Ashley, are reported to have accused their father of child abuse, including his holding a gun to Ashley's head and later to his own. Dunford's daughters allegedly made these statements to social service workers Church and Rigney, to Officer Dunaghan, and to Assistant Principal Lockhart. At trial, however, Dunford's daughters testified that the events did not occur as they were said to have related them, and they denied ever making the statements. The evidence of Dunford's use of the guns was important to the government because it provided direct evidence that Dunford knowingly possessed at least one of the guns which his brother had allegedly stored in his house.

The district court admitted the hearsay testimony of Church, Rigney, Dunaghan, and Lockhart for the truth of the statements, relying on Federal Rule of Evidence 803(24), a residual exception to the hearsay rule.[2] In admitting the evidence, the court recognized that the residual exception should be utilized only "after much consideration and examination." The court added, "this is the only time this judge has invoked the exception in twenty years of service on the bench. This court is of the opinion that this case presents circumstances which the writers of the exception anticipated would occur. A case where the court is convinced of the truthfulness of the statements but none of the specific hearsay exceptions apply."

In finding the hearsay statements trustworthy, the district court pointed to the repetition of the statements by both daughters at different times to different people under very serious circumstances. Moreover, Kia's statement that she was hit by her father was corroborated by the bruise that witnesses observed on her face. The court, referring also to other evidence of abuse by Dunford against his daughters, concluded that the hearsay statements had a "ring of truth" to them.

Dunford contends that the district court abused its discretion in admitting the evidence. He argues that the residual exception to the hearsay rule should be used "sparingly," and only when the court has made appropriate findings of trustworthiness. He maintains that the statements made by his daughters were not trustworthy, noting that they were "not contained in governmental, quasi-governmental or any type of official documents. These were the statements of two teenage girls allegedly given at a very difficult, emotional time—the arrest of their father."

Rule 803 provides in relevant part:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\* \* \* \* \* \*

■ (24) *Other exceptions.* A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. .

---

2. The residual hearsay exceptions, Rules 803(24) and 804(b)(5), have been consolidated, effective December 1, 1997, in new Federal Rule of Evidence 807. Since the lower court ruling occurred prior to the effective date of Rule 807, we analyze this case under Rule 803(24). However, we also note that our choice of Rule 803(24) versus Rule 807 does not affect our decision in this case, and anticipate that our holding today will continue to be valid under Rule 807, since that rule "combined" the similar Rules 803(24) and 804(b)(5) into one "Residual Exception," and "[n]o change in meaning [wa]s intended." *See* Fed.R.Evid. 807; Advisory Committee Notes to Rule 807 (1997). Similarly, in light of the merger of the two residual hearsay exceptions into new Rule 807, we find persuasive for purposes of applying Rule 803(24) precedent from Rule 804(b)(5). *See United States v. Clarke,* 2 F.3d 81, 83–84 (4th Cir.1993) (looking in part to Rule 803(24) precedent in order to interpret Rule 804(b)(5)).

As the Supreme Court has noted, this residual exception to the hearsay rule exists for the circumstance "[w]hen a party seeks to introduce out-of-court statements that contain strong circumstantial indicia of reliability, that are highly probative on the material questions at trial, and that are better than other evidence otherwise available." *Tome v. United States,* 513 U.S. 150, 166, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995). The most important element of Rule 803(24)'s requirements is that the district court properly determine that "equivalent circumstantial guarantees of trustworthiness" are present. *See* 2 *McCormick on Evid.* § 324, at 362 (4th ed.1992).

In the case before us, the district court concluded that such indicia were present because both daughters told different people of the gun incident at different times; because these statements were made to government officials in the most serious context of the arrest of their father; because Kia's bruises corroborated the part of her story in which she stated that her father hit her; and because the evidence of physical abuse in this case supplied a motive for the daughters to testify falsely in court. The serious nature of the repeated statements made by the children to government officials as well as the consistency of their stories given to those officials provide clear indicia of the trustworthiness of their statements.

Dunford argues that his daughters made the statements as part of a scheme to get him in trouble after he would not let them freely date boys. Even though Ashley testified in court that she had sometimes lied to get her father in trouble because he restricted her dating activity, she did not state that the gun story she told to Dunaghan, Lockhart, and Rigney was a lie. On the contrary, she denied that she ever made the statements. Such a denial seems inconsistent with the existence of the scheme alleged by Dunford. Moreover, there is no evidence in the record to suggest that the daughters schemed together to tell a consistent story to various state officials at different times.

Thus, in the total context in which the statements were made, we find that the district court did not abuse its discretion in finding sufficient "equivalent circumstantial guarantees of trustworthiness" to satisfy Rule 803(24). *See United States v. Clarke,* 2 F.3d 81, 84–85 (4th Cir.1993) (examining the "totality of the circumstances that surround the making of the statement" and concluding that the district court did not err in admitting under Rule 804(b)(5) an incriminating statement by the defendant's deceased brother at suppression hearing when that statement had the "ring of reliability"); *see also United States v. McHan,* 101 F.3d 1027, 1036 (4th Cir.1996) (holding prior grand jury testimony of unavailable witness admissible under Rule 804(b)(5) because statements made in the context of a grand jury proceeding possessed "requisite indicia of reliability"), *cert. denied,* —— U.S. ——, 117 S.Ct. 2468, 138 L.Ed.2d 223 (1997); *United States v. Shaw,* 69 F.3d 1249, 1254 (4th Cir.1995) (transcribed testimonies of witnesses from earlier trial of co-conspirator who were deceased at the time of trial were admissible under Rule 804(b)(5) because the circumstances surrounding the making of the statements gave them "the ring of reliability" (quoting *Clarke,* 2 F.3d at 85)); *United States v. Ellis,* 951 F.2d 580, 582–84 (4th Cir.1991) (Powell, J., sitting by designation) (prior testimony of deceased witness admissible because it possessed sufficient "indicia of reliability"); *United States v. Simmons,* 773 F.2d 1455, 1458–59 (4th Cir. 1985) (holding ATF trace forms admissible under Rule 803(24) in part because there was no reason for them to be false).

 The other three requirements of Rule 803(24) were readily satisfied in this case. The first requirement, that the statement be offered as proof of a material fact, was met because Dunford's knowing possession of the firearms was a material element of his § 922(g) violations. *See United States v. Wight,* 968 F.2d 1393, 1397 (1st Cir.1992). The second requirement, that the proffered statement be the most probative piece of evidence that could be obtained through reasonable efforts, was also met because the only other witnesses to the alleged incidents were biased as members of Dunford's immediate family. To disbelieve the testimony of Church, Rigney, Dunaghan, and Lockhart, one would have to assume a conspiracy

among them prior to Dunford's arrest, a conspiracy which was unsupported by any evidence. Finally, the third requirement, that the admission of the evidence promote the general purposes of the Rules and the interests of justice, is satisfied by the need for the jury to weigh the credibility of all of the evidence and to resolve the serious charges that a father has been accused of abusing his children with a firearm and then threatening them again with violence in order to prevent them from testifying to the truth at trial. We believe that the interests of justice supported the presentation to the jury of the prior statements of those children to teachers, policemen, and social workers so that the jury could weigh their truthfulness. To hold otherwise would tend to encourage the intimidation of witnesses and to suppress the truth.

The residual hearsay exception contained in Federal Rule of Evidence 803(24), which is now combined with former Rule 804(b)(5) in a successor provision, Federal Rule of Evidence 807, is a narrow exception that should not be construed broadly. To construe it broadly would easily cause the exception to swallow the rule. *See United States v. Mandel*, 591 F.2d 1347, 1368 (4th Cir.1979), *convictions affirmed en banc*, 602 F.2d 653 (4th Cir.1979), *further rehearing en banc denied*, 609 F.2d 1076 (4th Cir.1979), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980); 2 *McCormick on Evid.* § 324, at 361. In the circumstances of this case, however, we conclude that the district court did not abuse its discretion in finding the requirements of Rule 803(24) satisfied and in admitting the Dunford daughters' out-of-court statements for the truth of what they said.

## V

■ Dunford next contends that the district court erred in allowing the government to call his daughters to the stand for the sole purpose of impeaching their testimony in front of the jury. He argues that this practice is prohibited by our holding in *United States v. Ince*, 21 F.3d 576, 579–82 (4th Cir. 1994), in which we held that the admission of impeachment evidence was reversible error where the government's only apparent purpose in presenting the impeachment evidence was to introduce otherwise inadmissible hearsay of the defendant's alleged confession.

In the case before us, the government did not attempt to introduce inadmissible hearsay testimony through impeachment. Indeed, as noted above, the prior statements made by the daughters to state officials were admissible under Federal Rule of Evidence 803(24). Moreover, in *Ince* we explicitly recognized that because the "so-called 'impeachment' testimony was both highly prejudicial and devoid of probative value as impeachment evidence, the trial judge should have recognized the Government's tactic for what it was—an attempt to circumvent the hearsay rule and to infect the jury with otherwise inadmissible evidence of Ince's alleged confession." *Id.* at 582. But where a witness is called by the prosecution under circumstances where the witness might be impeached by otherwise *admissible* evidence, nothing in *Ince* prohibits the government from calling that witness.

In addition, in this case the government did not know for sure that Kia and Ashley would recant their prior statements that Dunford threatened Ashley with a gun and abused them. Even though there was some indication that the daughters might recant some of their earlier statements, in view of the fact that the two of them had made statements to at least four state officials, the government was certainly entitled to subpoena the daughters with the hope of obtaining some corroborating testimony. If we were to hold that the prosecution could never call a witness when it believed that the witness might lie, we would be providing an unfortunate incentive for witnesses to avoid having to testify merely by indicating that they planned to recant prior incriminating statements on the stand.

In short, the district court did not abuse its discretion in allowing the government to call Dunford's daughters as witnesses in the circumstances of this case.

## VI

■ Dunford next contends that the district court abused its discretion in admitting

evidence of the drugs and drug paraphernalia found by the police during the search of his home on October 4, 1995, particularly since he had already stipulated to being a user of a controlled substance for purposes of the charges under 18 U.S.C. § 922(g)(3) (prohibiting possession of a firearm or ammunition by an illegal drug user). He argues that in view of the stipulation, the evidence of drugs was irrelevant under Federal Rules of Evidence 401 and 402[3] and that its admission was unduly prejudicial under Federal Rule of Evidence 403.[4]

These arguments are almost identical to those made in *Old Chief v. United States,* 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997). In *Old Chief,* the defendant was charged with illegal possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Even though Old Chief had stipulated, for purposes of trial, that he was a convicted felon within the meaning of § 922(g)(1), the district court admitted the full record of his previous conviction for assault causing serious bodily harm. The Supreme Court rejected Old Chief's argument that the evidence was inadmissible under Rule 401, observing that even though the evidence may have been cumulative, it was nonetheless relevant—it tended to make a material fact, that he was a convicted felon, more likely. *See Old Chief,* 117 S.Ct. at 649. Similarly, in this case, since the evidence of drugs and drug paraphernalia found in Dunford's home tended to make the material fact of his being a user of illegal drugs for purposes of 18 U.S.C. § 922(g)(3) more likely, we conclude that the district court did not abuse its discretion in finding the evidence relevant under Rules 401 and 402.

In *Old Chief,* however, the Supreme Court did find that the trial court abused its discretion under Federal Rule of Evidence 403

where the court admitted the order of judgment and commitment for Old Chief's prior conviction to prove his legal status, thereby risking unfair prejudice because the jurors might improperly convict him based upon a propensity inference from his prior bad acts. The Court held that because of Old Chief's stipulation, the government had sufficient evidence to prove the legal status element, and the prejudice of its own supplemental evidence of the prior conviction outweighed its probative value. *See id.* at 650–56. Because proof of Old Chief's prior conviction depended on facts far removed in time from the underlying criminal firearm possession charged in the case, the Court invoked an exception to the general rule that the defendant cannot "stipulate or admit his way out of the full evidentiary force of the case as the government chose to present it." *Id.* at 653. The Court stated:

> This recognition that the prosecution with its burden of persuasion needs evidentiary depth to tell a continuous story has, however, virtually no application when the point at issue is a defendant's legal status, dependent on some judgment rendered *wholly independently of the concrete events of later criminal behavior charged against him.* As in this case, the choice of evidence for such an element is usually not between eventful narrative and abstract proposition, but between propositions of slightly varying abstraction, either a record saying that conviction for some crime occurred at a certain time or a statement admitting the same thing without naming the particular offense.... The issue is not whether concrete details of the prior crime should come to the jurors' attention but whether the name or general character of that crime is to be disclosed. Congress, however, has made it plain that the distinc-

---

**3.** Fed.R.Evid. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 402 provides the general rule that irrelevant evidence is inadmissible. *See* Fed.R.Evid. 402; *see also United States v. Queen,* 132 F.3d 991, 994 (4th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1572, 140 L.Ed.2d 805 (1998).

**4.** Rule 403 authorizes the exclusion of relevant evidence when its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403; *see also Westfield Ins. Co. v. Harris,* 134 F.3d 608, 615 (4th Cir.1998).

tions among generic felonies do not count for this purpose; the fact of the qualifying conviction is alone what matters under the statute.

*Id.* at 654–55 (emphasis added).

In this case, however, the evidence of illegal drug use related not to facts far removed in time from the underlying criminal firearm possession with which Dunford was charged. On the contrary, it was an "eventful narrative," *Old Chief,* 117 S.Ct. at 655—a relevant part of the very transactions leading to Dunford's arrest and indictment in *this case.* On visiting Dunford's house to arrest him for child abuse, the officers observed evidence of drugs, and it was this evidence that was used to obtain the search warrant which uncovered the firearms. It was also this contemporaneous evidence that disqualified Dunford from possessing a firearm. To have required the government to omit these highly relevant facts would have unduly cramped its case. Moreover, allowing the admission of contemporaneous evidence relevant both to the context and to the crime is not the type of prejudice that Federal Rule of Evidence 403 addresses, *see United States v. Queen,* 132 F.3d 991, 994 (4th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1572, 140 L.Ed.2d 805 (1998), nor is it the type addressed in *Old Chief, see* 117 S.Ct. at 654–55.

In sum, not only was the drug testimony relevant to Dunford's disqualifying status established as part of the eventful narrative and not from an earlier conviction, it was also contemporaneous evidence of what officers saw to obtain a search warrant and of what they discovered with the guns. Accordingly, the general rule that the defendant cannot stipulate away the government's case applies, and we hold that the district court did not, in the circumstances of this case, abuse its discretion in admitting the evidence of drugs and drug paraphernalia seized on October 4, 1995.

### VII

■ Finally, Dunford argues that the evidence submitted at trial was insufficient as a matter of law for a reasonable jury to find beyond a reasonable doubt that he had violated 18 U.S.C. § 922(g). We disagree.

Dunford stipulated to all elements of the offenses except the element that he knowingly possessed the firearms. And there was ample evidence in the record from which a reasonable jury could have inferred that he knowingly possessed the firearms. The jury could have believed the testimony that Dunford knowingly possessed a gun when he threatened to kill Ashley and then threatened to take his own life. It could have inferred his knowing possession of the guns because they were found in his house and because ammunition for them was found in Dunford's own bedroom in a bowl on his dresser. It could have imputed to Dunford the sign in his living room which read, "I'll give my gun up when they pry it from my cold dead fingers." Finally, it could have inferred Dunford's knowing possession based on the fact that the guns and ammunition were found in places where it was unlikely that Dunford could *not* have known that they were in his house.

For the foregoing reasons, we affirm one conviction of Dunford under 18 U.S.C. § 922(g) and reverse thirteen. And in view of this ruling, we also remand for resentencing.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR RESENTENCING.*