**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 10-4083**

UNITED STATES OF AMERICA,

              Plaintiff – Appellee,

       v.

ROYCE MITCHELL,

              Defendant – Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Robert J. Conrad, Jr., Chief District Judge.  (3:09-cr-00186-RJC-DSC-1)

Argued:  January 27, 2011            Decided:  May 5, 2011

Before TRAXLER, Chief Judge, and KING and WYNN, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED**:  Matthew Gridley Pruden, Noell Peter Tin, TIN, FULTON, WALKER & OWEN, PLLC, Charlotte, North Carolina, for Appellant. Mark A. Jones, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.  **ON BRIEF:** Anne M. Tompkins, United States Attorney, Charlotte, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Royce Mitchell entered a guilty plea in the Western District of New York on November 5, 2001, to Count III of an indictment charging him with conspiracy to possess with intent to distribute, and the actual distribution of, 500 grams or more of cocaine. See 21 U.S.C. §§ 841(a)(1), 846. The district court in New York accepted Mitchell's plea on March 14, 2002, and it sentenced him to seventy months of imprisonment, followed by forty-eight months' supervised release, which commenced on April 13, 2007. On September 15, 2009, Mitchell was arrested in Mecklenburg County, North Carolina, and charged with statutory rape and taking indecent liberties with a child, each of which is a felony under state law.[1]

Upon the petition of the federal probation office in the Western District of New York, the district court there issued a

_____

[1] A person eighteen or older may be convicted of statutory rape in North Carolina by being found to have engaged in vaginal intercourse or other sexual act outside of lawful marriage with another person between the ages of thirteen and fifteen. See N.C. Gen. Stat. § 14-27.7A. The crime is more serious if the defendant is six or more years older than the minor. See § 14-27.7A(a). A person sixteen or older commits the crime of taking indecent liberties with a child fifteen or younger if, being at least five years older than the child, he or she either "[w]illfully takes or attempts to take any immoral, improper, or indecent liberties . . . for the purpose of arousing or gratifying sexual desire," or "[w]illfully commits or attempts to commit any lewd or lascivious act upon or with the [child's] body or any part or member of the body." N.C. Gen. Stat. § 14-202.1.

2

warrant for Mitchell's arrest on September 21, 2009. On October 16, 2009, that court transferred jurisdiction over Mitchell to the Western District of North Carolina, see 18 U.S.C. § 3605, and he was ordered detained pending a hearing on the revocation of his supervised release, see 18 U.S.C. § 3583(e)(3). The hearing took place on November 25, 2009, pursuant to which the district court entered a judgment on January 13, 2010, granting the government's petition and returning Mitchell to prison to serve thirty months, to be followed by a new two-year term of supervised release. By timely Notice filed January 15, 2010, Mitchell appeals the district court's judgment. For the reasons set forth below, we affirm.

I.

A.

Fifteen-year-old Tiffany Wright was the adopted daughter of Mitchell's biological mother, Alma Wright. After Ms. Wright died on January 25, 2009, Mitchell and his wife housed Tiffany and applied to become her guardians. A few weeks after Ms. Wright's death, Tiffany became pregnant, and, on March 26, 2009, Mitchell released her to a group facility, where she resided for just a few days before being placed in a foster home on April 1, 2009. Conflict there resulted in her being transferred on May 27, 2009, to the care of a different foster parent, Susan

Barber. Tiffany confided to Ms. Barber that she believed Mitchell to be the father of her child. Ms. Barber immediately notified the state Department of Social Services, and she later repeated the allegation to Tiffany's therapist. Tiffany confirmed her belief in Mitchell's paternity to police detective Theresa Johnson in a recorded interview on August 19, 2009.

Shortly after 6:00 a.m. on September 14, 2009, as she was waiting on the street for her school bus, Tiffany was shot and killed; Tiffany's unborn daughter survived for a time before also succumbing. Mitchell was identified as a "person of interest" in the investigation, J.A. 574,[2] and, as mentioned supra, he was charged with the two felonies against Tiffany. The state dismissed both charges against Mitchell prior to his November 25 revocation hearing in federal court. Notwithstanding Tiffany's representations to the contrary, DNA testing ruled out Mitchell as the baby's father.

B.

1.

The penalty statute applicable to Mitchell's drug trafficking convictions provided, in pertinent part, that "any sentence imposed under this subparagraph shall . . . include a

---

[2] Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties to this appeal.

4

term of supervised release of at least 4 years." 21 U.S.C. § 841(b)(1)(B). The sentence imposed in Mitchell's case complied fully with that requirement, and the judgment also specified, as it was required to, see 18 U.S.C. § 3583(d), that Mitchell "not commit another federal, state, or local crime" while under supervision. J.A. 573, 575. Upon an allegation that he violated that condition or any other of his supervised release, Mitchell could be sent back to prison if the government showed by a preponderance of the evidence that the violation occurred. See 18 U.S.C. § 3583(e)(3); United States v. Copley, 978 F.2d 829, 831 (4th Cir. 1992).

2.

The district court so found in the case at bar, relying, in the absence of physical evidence, on the statements Tiffany made during her August 19, 2009 interview concerning her relationship with Mitchell. Tiffany told Detective Johnson that, in February 2009, she had twice engaged in consensual sexual intercourse with Mitchell, and that Mitchell was the father of her unborn child. It is beyond dispute that Tiffany's statements, if credited, were amply sufficient to support a finding that Mitchell more likely than not committed the offenses of statutory rape and taking indecent liberties with a child, as defined by North Carolina law. See supra note 1.

5

Tiffany's out-of-court statements were hearsay, see Fed. R. Evid. 801(c), and might have been excluded from the evidentiary record had Mitchell been tried on the state charges, or had proof of his conduct been at issue in a formal federal proceeding. See N.C. Gen. Stat. § 8C-1, Rule 802; Fed. R. Evid. 802. Revocation hearings, however, are intended to be more informal proceedings, at which the rules of evidence do not strictly apply. See Fed. R. Evid. 1101(d)(3); United States v. McCallum, 677 F.2d 1024, 1026 (4th Cir. 1982). Hearsay evidence may be introduced at such hearings if it is "demonstrably reliable." McCallum, 677 F.2d at 1026 (citations omitted). The decision to revoke Mitchell's supervised release is committed to the district court's sound discretion, and, absent an abuse of that discretion, not to be disturbed on appeal. See Copley, 978 F.2d at 831. In this case, the question of whether the district court abused its discretion is inexorably bound to the plausibility of its determination that Tiffany's statements were reliable.

3.

Mitchell contends that the statements were unreliable because they were uncorroborated, unsworn, and inconsistent with other statements Tiffany made, and because evidence of Tiffany's character detracted from her general credibility. We agree that physical evidence or testimony from a knowledgeable third party

6

would have helped to ascertain the true extent of Tiffany's and Mitchell's personal relationship, but it is hardly surprising that such an intimate matter, especially one associated with illegality and social taboos, would not be subject to ready corroboration. We cannot say that, under these circumstances, the government's inability to independently verify Tiffany's statements render them inherently unreliable.

We regard in much the same fashion the inability to obtain Tiffany's allegations under oath. Had Tiffany been sworn prior to her police interview, or had she been given an opportunity to review the transcript and attest to it under penalty of perjury, one could doubtlessly afford her statements incrementally more credence. It does not follow, however, that the lack of oath or affirmation renders Tiffany's account unworthy of belief.

We need look no further than our prior decisions addressing the proper application of the residual hearsay exception to realize there is no per se prohibition against unsworn hearsay statements being introduced into evidence. The evidence rules permit the admission of such statements even at formal proceedings insofar as they possess "circumstantial guarantees of trustworthiness" equivalent to those embodied in the traditional, codified exceptions. Fed. R. Evid. 807; see, e.g., Christopher Phelps & Assocs., LLC v. Galloway, 492 F.3d 532, 541 (4th Cir. 2007) (affirming district court's acceptance into

7

evidence of unsworn receipts for expenses and financial ledger on ground that admission appropriate under business records or residual exception); United States v. Dunford, 148 F.3d 385, 394 (4th Cir. 1998) (concluding that trial court did not abuse its discretion by admitting into evidence, pursuant to residual hearsay exception, unsworn statements of defendant's teenage daughters detailing abuse).

The district court explained at length why it considered Tiffany's statements, on balance, to be trustworthy. The court emphasized that it listened to the audio recording itself, as opposed to simply reviewing the bare transcript, and it found Tiffany's tone and demeanor to be sincere. She comported herself as a typical teenager, according to the court, evincing appropriate reluctance and embarrassment when discussing sensitive topics. The court pointed out that Tiffany did not passively signal agreement with the questions, but instead corrected Detective Johnson's misapprehensions and resisted other opportunities to embellish the story. The court was impressed with the level of detail Tiffany employed in describing her sexual encounters with Mitchell, noting that similarly detailed accounts of other interview topics had been corroborated by third parties.

The district court recognized that evidence had been presented of Tiffany's questionable character, including "her

hot temper, rebellious attitude, [and] occasional acts of dishonesty." J.A. 428. The court also acknowledged that her statements had been impeached to a degree, with contradictory evidence concerning "the number of sexual partners, the frequency of sex acts, the use of condoms, the location of sexual activity, and, importantly, whom she thought was the father of her child." Id. The court downplayed the latter point, observing that "given the frequency of the sexual activity, the changing calculation of due dates, based upon ultrasound results, she could be wrong without knowingly being false." Id. at 433. Regardless of Tiffany's vacillation on certain matters, she consistently admitted to sexual relations with Mitchell,[3] which, as the district court related, "lends credibility to her statement that Mitchell had intercourse with her twice." Id. at 435.

The district court concluded that the evidence of Tiffany's character and of her occasional inconsistency in relating her sexual history "goes to the weight the Court would assign to her statements, and not their admissibility." J.A. 428. The court's determination in that regard was clearly correct. See

---

[3] In addition to disclosing her encounters with Mitchell to Ms. Barber and Detective Johnson, Tiffany also told Mitchell's wife, precipitating the couple's breakup, and she communicated the same via a text message to her cousin.

United States v. Capers, 61 F.3d 1100, 1106 (4th Cir. 1995) (confirming that, once proper evidentiary foundation shows statement may be considered authentic, questions concerning witness's reliability "go to the weight of the evidence, not its admissibility" (citation omitted)); Williams v. McKenzie, 576 F.2d 566, 571-72 (4th Cir. 1978) (adjudging "weak" identification testimony of elderly crime victim in poor physical and mental condition sufficiently reliable to be admissible, with weight to be assessed by jury). The district court thoroughly documented why it chose to credit Tiffany's statements incriminating Mitchell, and, inasmuch as the court's reasoning appears sound and is supported by the record, we discern no error. The district court reasonably relied on Tiffany's statements to support its decision to revoke Mitchell's supervised release, and did not thereby abuse its discretion.

## II.

### A.

Mitchell also contends that he is entitled to a new hearing on the ground that the district court refused to consider evidence that he passed a polygraph test wherein he denied having engaged in sex with Tiffany, or having ever touched her for a sexual reason. Taking the position, perhaps, that what is

10

sauce for the goose is sauce for the gander, Mitchell maintains that the same rationale supporting the court's consideration of Tiffany's statements applies to his polygraph evidence.

In accordance with our authorities construing the Federal Rules of Evidence, which, as we have noted, do not govern revocation hearings, "[p]olygraph results are generally inadmissible." United States v. Blake, 571 F.3d 331, 346 (4th Cir. 2009) (citation omitted). Unlike hearsay statements, as to which we made allowance for appropriate use in hearings like Mitchell's, see United States v. McCallum, 677 F.2d 1024 (4th Cir. 1982), there is no similar precedent permitting the admission of polygraph results as substantive evidence in any proceeding. The lack of enabling authority is hardly surprising. The Supreme Court has commented that "there is simply no consensus that polygraph evidence is reliable," United States v. Scheffer, 523 U.S. 303, 309 (1998), a state of affairs that would seem to preclude such evidence meeting the McCallum test of "demonstrable reliability."

The McCallum threshold would be even more difficult to meet in this case, where the polygraph was administered outside the government's presence, giving it no opportunity to assist in setting the parameters of the examination or observe the manner of its conduct. Under those circumstances, the district court correctly observed that Mitchell's polygraph examination bore

11

"no indicia of reliability," concluding that the results "would not aid its decisional process." J.A. 386.

Moreover, even if the polygraph results in this case could be demonstrated reliable, they would be relevant solely as evidence of Mitchell's character for truthfulness, and admissible, if at all, only after the government attacked his character. See Fed. R. Evid. 608(b); United States v. A & S Council Oil Co., 947 F.2d 1128, 1134 (4th Cir. 1991) (reciting that circuit precedents "preclude . . . bolstering the credibility of a witness through evidence that the witness has taken a polygraph test"). No such attack occurred at the revocation hearing, insofar as Mitchell did not testify.

Mitchell nonetheless maintains that the Supreme Court's decision in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), opened the door for us to reconsider our precedent and develop a new framework to evaluate polygraph evidence. In United States v. Prince-Oyibo, however, we reaffirmed our commitment to our pre-Daubert rule barring the admission of polygraph results in most instances. See 320 F.3d 494, 501 (4th Cir. 2003). That being the case, the district court did not err in faithfully adhering to precedent and declining to consider Mitchell's polygraph evidence.

12

B.

Finally, it came to light after the revocation hearing that the police had been issued a warrant to obtain a DNA sample from Adrian Powell, whom police suspected in Tiffany's murder, upon his return to North Carolina from New York to testify on Mitchell's behalf. Mitchell filed a motion to reopen the hearing on the ground that the government's failure to provide the defense with this information violated the disclosure requirements of Brady v. Maryland, 373 U.S. 83 (1963), and United States v. Bagley, 473 U.S. 667 (1985). Mitchell contended then, as now, that the police's scrutiny of Powell, based on the likelihood that he was the resentful father of Tiffany's baby and was thus motivated to harm her, would have served to impeach Tiffany's assertions during her interview that Mitchell was the child's father.

The district court denied the motion, explaining that "Wright's statements regarding the paternity of the child . . . were discredited even without hearing the additional information." J.A. 564. As the court aptly indicated, "Powell's potential paternity has no bearing on . . . whether [Mitchell] violated his supervised release terms by also having sex with Wright." Id. at 565. The district court was plainly right on both counts, and it correctly declined to reopen the revocation hearing to receive evidence that could have no effect

13

on the ultimate disposition of the matter.  <u>See</u> <u>Brady</u>, 373 U.S. at 87 (confining prosecution's duty of disclosure to that favorable evidence "material either to guilt or punishment").

                                III.

     Pursuant to the foregoing, the judgment of the district court is affirmed.

                                                      <u>AFFIRMED</u>