**UNITED STATES OF AMERICA, Plaintiff**

**v.**

**WILLIAM KOENIG, ESTHER KOENIG, and
COASTAL GENERAL CONSTRUCTION
SERVICES CORP., Defendants.**

Crim. No. 97-155

United States District Court of the Virgin Islands

Div. of St. Thomas and St. John

March 9, 1999

440

Hugh P. Mabe, Esq., St. Thomas, U.S.V.I., Assistant U.S. Attorney, *for plaintiff*

Vincent Fuller, St. Thomas, U.S.V.I., *for William Koenig, defendant*

Gwendolyn Wilds, St. Thomas, U.S.V.I., *for Esther Koenig, defendant*

MOORE, *Chief Judge*

## MEMORANDUM

Pending before the Court is a series of three post-trial motions, including motions for new trials filed by both defendants under Federal Rule of Criminal Procedure 33, and a motion for judgment of acquittal filed by defendant Esther Koenig under Federal Rule of Criminal Procedure 29(c). For the reasons outlined below, all the motions will be denied.

## INTRODUCTION

On April 22, 1998, William and Esther Koenig were convicted on all counts of a multi-count indictment.[1] William Koenig was president and principal owner and Esther Koenig was vice-president and co-owner of Coastal General Construction Services

---

[1] Count VI was dismissed against Esther Koenig.

441

Corporation ["Coastal"]. Coastal entered into a contract to renovate and modernize the Donoe housing project for the Virgin Islands Housing Authority ["VIHA"] in 1988. VIHA operates using funds provided by the United States Department of Housing and Urban Development ["HUD"]. Ultimately, the contract was not approved by HUD. In February of 1992, the Koenigs, through Coastal, sought compensation by filing a "termination claim" for start-up expenses of $1,114,799. In April of 1992, they demanded arbitration of the claim, which would subsequently increase to $2,343,933. Arbitration began in November.

The indictment alleged that Mr. Koenig testified and presented false documents at the arbitration hearing by, for instance, submitting bills for items Coastal already owned before the project or for items never actually purchased for the Donoe renovation. Based on this evidence, the arbitrator awarded a substantial sum. Investigation by the Government unearthed irregularities, and HUD expended monies to overturn what it concluded was a fraudulently obtained award. The Government charged fraud, conspiracy to commit fraud, and use of the mails to further that fraud.

Count I charged that the Mr. and Mrs. Koenig conspired to defraud VIHA and HUD through inflated claims made during the arbitration demanded by Coastal in violation of 18 U.S.C. § 371. Counts II-XII were separate false statements submitted to the arbitrator in violation of 18 U.S.C. § 1001. Counts XIII-XVII were individual mailings sent "for the purpose of executing and in furtherance of such scheme" in violation of 18 U.S.C. § 1341.

## MOTION FOR JUDGMENT OF ACQUITTAL

Esther Koenig moves for a judgment of acquittal based on two theories: 1) that the government failed to present sufficient proof, and 2) that the government failed to prove that the fraud was "in any matter within the jurisdiction of any department or agency of the United States" as required by 18 U.S.C. § 1001.

### Sufficiency of the Evidence

■ In reviewing Esther Koenig's argument for judgment of acquittal, this Court must determine whether there was substantial evidence upon which a reasonable jury could have based its

442

verdict. *See United States v. Obialo*, 23 F.3d 69, 72 (3d Cir. 1994). The Court must view the evidence in the light most favorable to the government and draw all reasonable inferences therefrom in the prosecution's favor. *See United States v. Forde*, 1998 U.S. App. LEXIS 31087, No. 97-7469, slip op. at 5 (3d Cir. Nov. 6, 1998).

*Conspiracy*

Esther Koenig argues that the evidence was neither sufficient to show she entered into the unlawful agreement in the conspiracy count nor that she knowingly and willfully joined the conspiracy.

█ The government need not prove the existence of a formal agreement. The elements of the conspiracy may be proved "entirely through circumstantial evidence." *United States v. Kapp*, 781 F.2d 1008, 1010 (3d Cir. 1986), *cert. Denied*, 475 U.S. 1024, 106 S. Ct. 1220, 89 L. Ed. 2d 330 (1986). The existence of a conspiracy can be shown by "evidence of related facts and circumstances from which it appears as a reasonable and logical inference, that the activities of the participants . . . could not have been carried on except as the result of a preconceived scheme or common understanding." *United States v. Ellis*, 595 F.2d 154, 160 (3d Cir. 1979), *cert. denied*, 444 U.S. 838, 62 L. Ed. 2d 49, 100 S. Ct. 75 (1979).

The indictment alleges in Count I that the Koenigs conspired with each other to defraud the United States by making false statements (18 U.S.C. § 1001) and using the mails (18 U.S.C. § 1341) all in violation of 18 U.S.C. § 371. Count I alleged as overt acts Counts II-XII (false statements) and Counts XIII-XVII (fraudulent mailings).

The Government's case provided sufficient evidence that Esther Koenig was a full participant in the operation of Coastal, running the finances and administration of the corporation.[2]

1. The project manager on the Virgin Islands Housing Authority contracts identified Esther Koenig as handling the financial affairs, money and accounting, while William Koenig was in charge of operations. (Vol. II at 181-186, 202, 203.) She made financial

---

[2] The Court appreciates the thoroughness of the Government's summary of the evidence presented in its opposition to the motion.

decisions for Coastal. (Vol. II at 204.) She sometimes refused financial commitments made by her husband. (Vol. II at 186, 205.)

2. Coastal's accountant identified Esther Koenig as president and treasurer for Coastal. (Vol. III at 12, 13.) The positions of president and vice president for all other Coastal corporations were filled by either William or Esther Koenig. (Vol. III at 14.)

3. The accountant dealt with Esther Koenig on financial matters, (Vol. III at 16.), and his testimony established that Esther Koenig knew that Coastal had no equipment assets as of December 31, 1988, the date of a financial statement which the Koenigs had requested to help obtain a bond and a joint venture partner for the VIHA contract. Since the financial statement reflected zero tangible assets, unaudited supplementary information provided in part by Esther Koenig identifying equipment assets which Coastal could use to perform the contracts was attached to the financial statement in order to show Coastal's ability to perform the contracts. (Vol. III at 19-21.) Esther Koenig thus knew what equipment had been acquired by Coastal before the contract for the Donoe Project.

4. Esther Koenig also attended the arbitration hearing on the day William Koenig testified under oath and made the false statements that Coastal had purchased certain equipment specifically for the Donoe Project during the fall of 1988. She was there while William Koenig introduced through his sworn testimony the fraudulent documentation. (Vol. II at 47, 76, 217.) VIHA's Counsel testified that she believed that Esther Koenig was at the arbitration as a representative of the corporation, where she was seated with her husband, their counsel, and their accountant. (Vol. II at 47, 76-80.) The arbitrator testified that Mrs. Koenig was present during part of the proceedings. He understood her to be there to supply information to her husband. (Vol. II at 214, 240.)

5. The jury had ample evidence from which to find that Esther Koenig aided and abetted her husband in presenting false statements and documentation when he testified at the arbitration that all of the equipment purchases were made during the time period October to December, 1988, specifically for the Donoe Project, a fact that she knew to be false.

6. The evidence was also sufficient for the jury to find that she aided and abetted the presentation of fraudulent statements and

444

documents claiming that her personal account was the source of the payment for two fictitious equipment purchases. "Paid EK's personal acct." and "EK" in a paid stamp block appeared on several documents, including quote letters and invoices for equipment (Vol. II at 55, 66.) Also on Exhibit 12, the initials "EK" are inside a "paid" stamp.

7. False statements were made regarding transactions with Kane Caribbean. Testimony was presented at trial regarding the sale of two pieces of equipment to Coastal in 1987. (Vol. II at 144-51.) Esther Koenig signed a purchase stipulation, lease agreement and delivery receipt, all dated April 6, 1987. When Coastal failed to make payments, Kane sought the collection of the debt. (Vol. II at 153.) A Kane employee testified that he dealt primarily with Esther Koenig during the collection effort. (Vol. II at 156.) The jury could reasonably have concluded that Ester Koenig knew that this was not equipment purchased for the Donoe Project and participated in the scheme to present these false claims to the arbitrator.

8. A manager for the seller testified that two trailers were sold to Coastal for $5,000 each in October and November of 1986. (Vol. II at 122-28.) William Koenig testified at the arbitration that he purchased them in October of 1988 for a total cost of $28,500. William Koenig presented an altered letter during the arbitration on which the date was changed from the year 1986 to 1988 and a reference to "Donoe/VIHA Site Trailer" was added. The true letter transmitting the title to one of the trailers was dated December 12, 1986, and bore no reference information. Esther Koenig signed a return receipt card evidencing the receipt of a letter and the title to a mobile trailer office in 1986. (Vol. II at 129-30; Exh. 2b-3.) The Government proved these transactions occurred in 1986 and not in 1988 as falsely claimed by the defendants. (Vol. II at 131-33.) Esther Koenig thus knew these documents were false when they were being presented to the arbitrator.

A reasonable jury could therefore find, among other things, that Esther Koenig knew the falsity of the evidence and testimony presented in the arbitration, the basis for each of Counts II-XII, and that she did nothing to advise the arbitrator of the fraud. The Court agrees that she had a duty as a corporate officer to prevent this crime and that her failure to do so amounted to an adoption of her

445

husband's false statements as her own. *See United States v. Ojala*, 544 F.2d 940, 945-46 (8th Cir. 1976)(defendant's silence in the face of inculpating statements by the defendant's attorney while in his presence manifested "his adoption or belief" of his attorney's statements making them the defendant's admissions under FED. R. EVID. 801(d)). Moreover, Esther Koenig was aware of the false and fraudulent nature of the claims when her husband/business partner presented them in the arbitration and she knowingly assisted him in presenting those false statement to the arbitrator. She sat next to him at Coastal's table while he testified in order to be able to provide additional aid and assistance. The evidence showed that she helped put the documents for the claims together for presentation to the arbitrator. The jury therefore reasonably found that Esther Koenig not only adopted the statements as her own, but that she actively aided in their presentation to the arbitrator.

## Aiding and Abetting/Substantive Offenses

■ Based on the same evidence, the jury reasonably convicted Esther Koenig as either an active participant or aider and abettor of the underlying substantive offenses. Additionally, based on her conspiracy conviction, there was sufficient evidence to convict her of all the substantive offenses committed by her husband during the existence of and in furtherance of the objectives of the conspiracy, which consisted of all the substantive counts for which she was charged and convicted. *See Pinkerton v. United States*, 328 U.S. 640, 645, 90 L. Ed. 1489, 66 S. Ct. 1180 (1946).

## Mail Fraud

Esther Koenig argues the insufficiency of the evidence of mail fraud in that the "transcript is devoid of any evidence tending to show that [she] wrote, mailed or had mailed any of the correspondence the government alleges constituted mail fraud." (Mot. at 24.) The Court gave the following instruction on what the law required the government to prove in that regard.

The government is not required to prove that the defendant actually mailed anything or that the defendant

even intended that the mails would be used to further, or to advance, or to carry out the scheme or plan to defraud.

The government must prove beyond a reasonable doubt, however, that the mails were, in fact, used in some manner to further, or to advance, or to carry out the scheme to defraud. The government must also prove that the use of the mails would follow in the ordinary course of business or events or that the use of the mails by someone was reasonably foreseeable.

It is not necessary for the government to prove that the item itself mailed was false or fraudulent or contained any false or fraudulent statement, representation, or promise, or contained any request for money or thing of value.

The government must prove beyond a reasonable doubt, however, that the use of the mails furthered, or advanced, or carried out, in some way, the scheme or plan to defraud.

Vol. III at 156-57. *See* 40.04 Devitt, Blackmar & O'Malley, Federal Jury Practice & Instructions (4th Ed. 1990).

 For example, Count XIII was a letter from the Koenigs' attorney to the administrator of the arbitration association correcting an error in the brief supplied to the arbitrator. Counts XIV and XV were letters from Mr. Koenig mailed to the executive director of VIHA regarding interest accrual on the arbitral award. A reasonable jury could find that the government proved that the mails were used to further the scheme to defraud as alleged in Counts XIII-XVII and that the use of the mails was reasonably foreseeable by Esther Koenig.

**Within The Jurisdiction of Any Department or Agency of The United States**

The remaining issue is Mrs. Koenig's argument that making false claims to VIHA does not give this Court jurisdiction under 18 U.S.C. § 1001 merely because VIHA receives federal funds. Although this same claim was raised pre-trial and was denied on March 25, 1998, the Court will reiterate its reasoning here.

The indictment charged that false statements were made "in a matter within the jurisdiction of the Department of Housing and Urban Development, a department of the United States." Section 1001 applies to "any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States. . . ." Clearly, the allegedly false statements were made in a matter within the jurisdiction of a department of the executive branch of the United States, even though they were first delivered to an agency of the Territory.

The United States Court of Appeals for the Eleventh Circuit dealt with a very similar issue in *United States v. Herring*, 916 F.2d 1543 (11th Cir. 1990), *cert. Denied*, 500 U.S. 946, 114 L. Ed. 2d 488, 111 S. Ct. 2248 (1991). The defendant had made false statements to the Georgia Department of Labor. The court found jurisdiction, reasoning that the

> United States Supreme Court has stated that jurisdiction within the meaning of section 1001 should not be narrowly or technically defined. Moreover, this court has held that false statements need not be presented to an agency of the United States and that federal funds need not actually be used to pay a claimant for federal agency jurisdiction to exist under section 1001.

*Id.* at 1547 (citations omitted); *see also United States v. Rodgers*, 466 U.S. 475, 480, 80 L. Ed. 2d 492, 104 S. Ct. 1942 (1984)("the term 'jurisdiction' should not be given a narrow or technical meaning for the purposes of § 1001."); *United States v. Gibson*, 881 F.2d 318, 322 (6th Cir. 1989)(finding fraudulent statements relating to sale of tires by service station to coal company which provided coal to Tennessee Valley Authority amounted to matter within the jurisdiction of government agency); *United States v. Lawson*, 809 F.2d 1514, 1518-19 (11th Cir. 1987)(finding false statements within jurisdiction of HUD where statements made during a deposition in litigation between contractor and city housing authority where HUD funded housing authority); *United States v. Suggs*, 755 F.2d 1538, 1542 (11th Cir. 1985)("The fact that a state agency uses federal funds is generally sufficient" to establish jurisdiction under § 1001. (citing *United States v. Baker*, 626 F.2d 512, 514 (5th Cir. 1980) and *United States v. Richmond*, 700 F.2d 1183, 1187-88 (8th Cir. 1983)).

The Executive Director of VIHA testified that VIHA is a public corporation organized under the federal Housing Act of 1937 tasked with developing and managing low income housing. (Vol. I at 155-157.) VIHA has approximately 5,000 units in which it houses roughly 15,000 residents. The annual subsidy from HUD represents ninety-nine percent of VIHA's operation budget, while its capital improvement program under which VIHA modernizes its public housing communities is one hundred percent funded by HUD. (Vol. I at 158.) VIHA applies for those HUD funds on an annual basis, and if approved by HUD, an annual contract for each program is signed by HUD and VIHA, obligating VIHA to manage the program and spend its funds in accordance with federal law, rules and regulations. The contract between VIHA and Coastal (Exh. 22) had general conditions attached which were provided by and required by HUD to be a part of the contract and were on a preprinted form identified as a HUD form. (Vol. I at 162-64.) HUD approval was required for the contract at the time it was entered into.

The Donoe Project contract was not approved, however, which led to VIHA's termination of the contract. (Vol. I at 165-66.) In connection with Coastal's termination claim, the demand for arbitration was made pursuant to a provision of the general conditions on the HUD form at paragraph 17(b). (Vol. I at 176.) After the arbitration award, VIHA retained outside counsel to get the award vacated. HUD funds provided the source for retaining the outside counsel. In order to accomplish the use of the HUD funds under the Comprehensive Improvement Assistance Program to pay for outside counsel, VIHA had to submit a budget revision to HUD seeking to reprogram the funds from other planned projects and obtain HUD approval. (Vol. I at 180-81.)

■ The VIHA Executive Director identified an approved budget revision package which included reprogramming funds for litigation expenses in connection with the Donoe Project and which referenced the need for private legal counsel to assist on contract claim litigation relative to the Donoe Project. (Vol. II at 12-15; Exh. 50.) The HUD approval response also makes reference to funds for services for a private attorney. (Vol. II at 16-17.) The process for paying attorneys fees and costs involved the submission of a

requisition to HUD for funds and HUD wire transferring the funds for VIHA to be able to issue a check. (Vol. II at 27-29.) Moreover, the funding source for the payment of the termination claim was HUD money. (Vol. I at 190.) The jury thus had sufficient evidence before it to conclude reasonably that the false statements were made "in any matter within the jurisdiction" of any department or agency of the United States as required by 18 U.S.C. § 1001.

Next, Esther Koenig attempts to relitigate her husband's motion to dismiss, which was denied by this Court before trial:

> Defendant William Koenig's motion to dismiss is premised on the ridiculous assumption that because this Court lacked subject matter over a civil case involving these same underlying facts that this Court does not have jurisdiction to hear this criminal matter.
>
> The United States Court of Appeals for the Third Circuit held that this Court did not have federal question jurisdiction to affirm or vacate an arbitration award, a matter that had been removed to this Court from the Territorial Court, in *Virgin Islands Housing Authority v. Coastal General Construction Services Corporation*, 27 F.3d 911 (3d Cir. 1994). The Court of Appeals found that "essentially, the dispute between the parties is whether the Housing Authority could terminate the contract without paying for the expenses that Coastal had incurred up to that point. This dispute is thus governed by local, not federal, law." *Id.* at 917.
>
> Lack of jurisdiction over a contract dispute can in no way create a lack of jurisdiction over a criminal matter in which federal statutes are implicated.

Mem. & Order of March 25, 1998 at 3-4.

Mrs. Koenig has presented nothing to cause the court to reconsider this ruling.

*Materiality*

Finally, Esther Koenig argues that the government failed to establish the materiality of the fraudulent statements. "Materiality" means the statements were capable of influencing the matter

450

within the jurisdiction of HUD. *See United States v. Greber*, 760 F.2d 68, 72-73 (3d Cir. 1985), *cert. denied*, 474 U.S. 988, 88 L. Ed. 2d 348, 106 S. Ct. 396 (1985)(holding that materiality necessary element of section 1001).

A reasonable jury could find that the fraudulent statements were made to the arbitrator seeking an inflated money award. The arbitrator testified that the documents presented and statements made were capable of influencing his award. (Vol. II at 235-36.) These statements influenced VIHA and thereby influenced HUD as the Government summarized in its opposition.

> After the arbitration award in the amount of $1,262,049, VIHA retained outside counsel to get the award vacated. . . . Vol. II, p. 180. HUD funds paid for the outside counsel. In order to accomplish the use of the HUD funds under the Comprehensive Improvement Assistance Program (CIAP), VIHA had to submit a budget revision reprogramming the funds from other planned projects and obtain HUD approval. Vol. II, p. 181. VIHA did receive that approval and Exhibit 50 documented one such HUD approved budget revision to fund private retained counsel for litigating the Donoe Project arbitration award given to Coastal General. It was made clear in Mr. Francois' testimony that the funding source for the payment of a termination claim would be HUD funds. Vol. I, p. 190.

(Gov't's Opp. to Mot. at 17.)

■ A jury reasonably could find that the statements not only were capable of influencing HUD, but that they did in fact influence HUD to expend additional funds to overturn the award.

## MOTIONS FOR NEW TRIAL

The motions for new trial are based on alleged juror bias. The defendants state that, after the case went to the jury and the alternate jurors were excused, their daughter, Tina Capo, informed them that "one woman on the jury had previously done business with us and another juror attended our church and asked why I did not attend church with my wife." (Aff. of W. Koenig at 1.) The

defendant's daughter, who had not been at trial the first two days, affirms that she asked her mother "whether she realized that one of the jurors was our manicurist and the other looked familiar." (Aff. of T. Capo at 1.) Mrs. Koenig "did not recognize the manicurist and . . . the other she could not place." (*Id.*) No one relayed this information to defense counsel while the jury was still deliberating.

Only after the jury returned its guilty verdict did Esther Koenig tell her husband that one of the jurors had been her manicurist and that the juror's husband was a welder who had at times worked for the Koenigs and that she had spoken with him by phone at some time. (Aff. of W. Koenig at 2.) William Koenig now claims that he and the juror's husband had a "disagreement . . . acrimonious words were exchanged and [he] ceased to do business with [the welder] after this incident" three or four years earlier. In spite of this supposedly acrimonious dispute, says Mr. Koenig, his daughter inquired into the welder's prices just last year. (*Id.*)

Then, a week after the guilty verdict, Ms. Capo went to the salon where the manicurist worked and

> asked her for permission to inquire how she reached her verdict. She responded "how dare you ask me. You weren't there during the whole trial" and that "[you] only came for the last day"; [Ms. Capo] then asked her how she arrived at her decision; she replied that Mrs. Koenig's signature was on the paper; [Ms. Capo] then asked her if anyone did an analysis of Mrs. Koenig's signature; She then asked me why the Koenig's [sic] did not take the witness stand; that on the next business day, [Ms. Capo] reported this incident to Mrs. Koenig's attorney.

(Aff. of T. Capo at 1.)

Mrs. Koenig asserts the same basic facts. She says she too had had direct dealing with the juror regarding the business relationship with the juror's welder husband. Mrs. Koenig also claims "that on one particular occasions [sic] I declined to allow the juror to clip my cuticles for sanitary reasons; That she was visibly annoyed and as a result, I did not return to her for her services." (Aff. of E. Koenig at 1.) She adds "that with respect to [another]

452

Juror . . . , I saw her after the trial singing on the choir at church, however she turned her head when I looked at her in recognition." (Aff. of E. Koenig at 2.)

The defendants argue that this "new evidence" of a potential bias on the part of two jurors is sufficient to warrant a new trial. The government asserts in opposition that the defendants waived their claim by failing to bring it to the attention of the Court, that the defendants have not met their burden, and that inquiry into the deliberative process is precluded by Rule 606(b) of the Federal Rules of Evidence.

■ This Court agrees that the Koenigs waived any claim of juror bias by not advising the Court of these allegations at a time when the Court could have done something about them. This Court conducted voir dire to find out whether any member of the jury panel recognized any of the defendants or had provided goods or services to Coastal. One member of the panel was excused due to his familiarity with the defendants. None of the jurors acknowledged any relationship or familiarity before they were empaneled. Waiver has been found where juror misconduct was only alleged, as in the Koenig's case. *See, e.g., United States v. Dean*, 667 F.2d 729, 730, 734 (8th Cir. 1982)(holding that the defendant, by not bringing his knowledge of possible juror bias to the attention of the district court prior to verdict, waived his right to a new trial). Waiver has also been found where there was actual misconduct. *See, e.g., United States v. Gootee*, 34 F.3d 475 at 475-479 (7th Cir. 1994)(finding defendant waived claim of juror misconduct by not bringing it to the court's attention at the time he became aware of it)(citing *United States v. Bolinger*, 837 F.2d 436, 438-39 (11th Cir. 1988)(same), *cert. denied sub nom. De La Fuente v. United States*, 486 U.S. 1009, 100 L. Ed. 2d 200, 108 S. Ct. 1737 (1988)); *United States v. Jones*, 597 F.2d 485, 488 n.3 (5th Cir. 1979)("a defendant cannot learn of juror misconduct during the trial, gamble on a favorable verdict by remaining silent, and then complain in a post-verdict motion that the verdict was prejudicially influenced by that misconduct"), *cert. denied*, 444 U.S. 1043, 62 L. Ed. 2d 728, 100 S. Ct. 729 (1980); *see also* 96 A.L.R. 530 (1935) ("The general rule is that misconduct on the part of anyone in connection with the jury after their retirement, although it be of a

character which might vitiate the verdict if brought to the attention of the court by timely complaint, is not available after the return of the verdict, as a ground for a new trial or reversal, where it was known to the defendant or his counsel before the return of the verdict.").

Even if the defendants did not waive the issue, there still is no basis for a new trial. The United States Court of Appeals has announced a five-part test to apply when a defendant seeks a new trial based on "newly discovered evidence":

> (a) the evidence must be in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on[] must not be merely cumulative or impeaching; (d)it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*United States v. Adams*, 759 F.2d 1099, 1108 (3d Cir. 1985).

■ Here, the defendants cannot overcome the first hurdle. The defendants knew before the jury returned its verdict that possibly two of the jurors knew one or both of them.[3] The defendants were still required to raise the issue with the Court even if they were not entirely sure of the conflict at the time.[4] *See United States v. Dean*, 667 F.2d at 730, 734 (claim waived despite defendant's inability to name potentially biased juror until after trial).

While failure to show that the evidence was newly discovered is enough to deny the motion, the defendants have not met four of the tests. They have proffered no evidence from which the Court

---

[3] Indeed, as for the manicurist, her occupation and place of employment were declared on the juror questionnaire. (Opp. at 7.)

[4] "While the jury was deliberating, my daughter asked me whether I recognized two of the jurors. I responded that one of the juror looked familiar but I could not place her and the other I did not recognize as our manicurist because her hair was pulled back." (Aff. of Esther Koenig at 1.) "At Mano's while the jury was deliberating my daughter said to my wife, 'Don't you recognize the lady on the jury with the flip hairdo as your manicurist with whom you had an argument?' My wife responded, 'No.' Therefore, I did not give this suggestion any more thought at the time." (Aff. of William Koenig at 2.)

could infer diligence on their part. Indeed, their evidence implies a lack of diligence. Further, the evidence is not material nor would it probably produce an acquittal, although it is not merely cumulative or impeaching. Finally, the evidence is far from sufficient for the Court to infer bias on the part of the jurors. Since the Koenigs say that they did not recognize the two jurors until their daughter informed them who the jurors were, it is just as likely that the jurors also did not recognize the defendants until after the trial, when the daughter confronted one of them at her workplace and the other saw the defendant from the choir loft. In any event, the evidence is insufficient to require, or even justify, further inquiry.

The Court thus finds that the defendants waived the claim of juror bias by not bringing it to the Court's attention at an appropriate time or, alternatively, that the defendants failed to meet the test for a new trial based on new evidence. Accordingly, the motion for a new trial based on alleged juror bias will be denied.

Defendants also argue that the jurors impermissibly considered the decision of the defendants not to testify. Such argument is based on Ms. Capo's affidavit that a juror asked her why the defendants did not take the witness stand during a post-trial discussion. Federal Rule of Criminal Procedure 606(b) prevents this type of inquiry by a court. "[A] juror may not testify as to . . . the effect of anything upon that or any other juror's mind or emotions as influencing the juror . . . or concerning the juror's mental processes" except as regards extraneous prejudicial information, *e.g.*, a material newspaper story in the jury room, or improper outside influence, *e.g.*, comments by the bailiff, which have not been alleged. Fed. R. Crim. P. 606(b). "Nor may . . . any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes." *Id.* Rule 606(b) is directly on point: the defendants are asserting improper mental processes. "The mental operations and emotional reactions of jurors in arriving at a given result would, if allowed as a subject of inquiry, . . . invite tampering and harassment." *Id.* Adv. Comm. Notes (1972).

■ The policy of protecting jurors would be abrogated if the Court considered the assertions made by the defendants; the juror

was confronted at her workplace by a relative of the defendants and had expressed a desire not to discuss the matter. ("How dare you ask me." Aff. of Tina Capo at 1.) It was highly improper for an immediate family member of a defendant to confront and interrogate a juror on the content of a jury's deliberations. Moreover, a juror's curiosity about why the defendants did not testify gives no basis to infer that this particular juror, much less the rest of the jury, violated the Court's explicit instructions not to consider the defendant's decision not to testify in reaching their verdict.[5] This is precisely the kind of inquiry into the jury's deliberative process that is off-limits.

## CONCLUSION

The motion for judgment of acquittal and the motions for new trial will be denied.

---

[5] The Court gave the following instruction.

### Defendant's Right Not to Testify

The defendants William Koenig and Esther Koenig did not testify in this case. Under our constitution, they have no obligation to testify or to present any other evidence because it is the prosecution's burden to prove the defendant guilty beyond a reasonable doubt. The burden remains with the prosecution throughout the entire trial. It never shifts to the defendant. Each defendant is not required, never required to prove that he or she is not guilty.

You may not attach any significance to the fact that a defendant did not testify. No inference of any kind may be drawn by you because they did not take the witness stand. You may not consider this against either or both of the defendants in any way in your deliberations in the jury room.

The law never imposes upon the defendant in a criminal case such as this the burden of calling any witness or producing any evidence.

Vol. III at 136-37. *See* 15.14 Devitt, Blackmar & O'Malley, Federal Jury Practice & Instructions (4th Ed. 1990).