**GOVERNMENT OF THE VIRGIN ISLANDS, Plaintiff**
**v.**
**EUGENE WILLIAMS,** Defendant

Criminal No. 39/2001

Territorial Court for the Virgin Islands

Division of St. Croix

February 14, 2002

 

JAMES PATRICK GEOCARIS, ESQ., Assistant Attorney General, St. Croix, U.S. Virgin Islands, *Attorney for Plaintiff*

MARTIAL A. WEBSTER, ESQ., St. Croix, U.S. Virgin Islands, *Attorney for Defendant*

ROSS, *Judge*

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant's Motion for Judgment of Acquittal and/or New Trial pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure respectively, applicable to trials in the Territorial Court pursuant to TERR. CT. R. 7, to which the Government has responded. The Defendant Eugene Williams files this motion after having been tried and convicted by a jury on charges of Unlawful Sexual Contact, First Degree along with two counts of Child Abuse. Because the same jury acquitted him of the more serious crimes of Aggravated Rape and Rape in the First Degree, the defendant asserts that the verdict is inconsistent and contrary to the weight of the evidence. Secondly, the defendant contends that the Court admitted impermissible hearsay evidence, which he surmises violated the defendant's 6th Amendment Rights to confront his accusers, amounting to prejudicial error. In response, the Government argues that under the circumstances of this case the Court did not abuse its discretion in admitting the relevant out of court statements, nor were the defendant's rights under the confrontation clause violated because the defendant had ample opportunity to cross-examine the victims who testified at trial. For the following reasons, Defendant's motions shall be denied.

## FACTUAL BACKGROUND

The procedural obstacles that arose in the presentation of the evidence in this trial, although seemingly atypical when compared to the average case, has been demonstrated to be the norm for cases where the perpetrator of sexual abuse against minor victim has been an adult

member of the household. In these types of cases the victims are generally reluctant to testify for fear of the inevitable and often stigmatizing consequences that the testimony will impart on them and their loved ones. The difficulty usually heightens with the lack of physical traces to corroborate the abuse.[1]

The case *sub judice* involves two minor girls—M, age 13, and K, age 10. Although the girls had initially made statements to several adults regarding the sexual abuse, prior to trial they began recanting the statements by refusing to speak of the allegations and the prosecutor was obliged to call them to the stand as adverse witnesses. Despite their apparent refusal to cooperate, the clear weight of the evidence adduced at trial overwhelmingly supports the conclusion that their mother's husband sexually abused them and that they justifiably feared under the circumstances that testifying against him would create dire consequences for their mother and family. To begin, the record is replete with evidence demonstrating that while the girls were on the witness stand their recollection of everything that had transpired was remarkably sharp—but that fear of the outcome marred their ability to freely relate the facts surrounding the sexual abuse.

As regards M's testimony, while she says she doesn't remember any of the things that she told Dr. Matthew on September 27, she instantly belies the veracity of such failure to recollect. When visibly troubled by the prosecutor's characterization of the sequence of events at Dr. Matthew's office, she replies with absolute conviction that Dr. Matthew's physical examination came first and only then did she speak to Dr. Matthew. M's reaction strongly bespeaks of her acute memory regarding all that had transpired that day, including (very likely) the details of her conversation with Dr. Matthew. She displays similar arrogance on her ability to perfectly recall the events of that day, when intimating that she recalled that her mother, father, sister, Hope, the police officer and Clema Lewis were present at the doctor's office—and that it was Hope and the police officer that questioned her regarding the sexual abuse. She also was aware that her answers were being recorded by hand. She admitted to having signed her name in the presence of her mother,

---

[1] It is important to note the fact that very often in child sexual abuse cases—if any physical traces are left by the perpetrator—they are not readily visible to the average lay person's naked eye, including as in this case the parents.

originally as Yaskella and then crossing it out to replace it by MH. Then when asked whether she recalls having responding "yes" to the question, "Did someone give you a bad touch?" she replies, "Yes." It was not until she was asked whether the statement reflected who that person was and whether it stated that the person was "Eugene Williams, her stepfather," that she begins to avoid the direct line of questioning by saying she doesn't remember. And when asked how she responded to the question how her stepfather touched her, and whether she had replied, "He used to play with me by tickling me, biting me on my breast. He would touch me all over my body to include my vagina." she alleges that that was not her statement. She then denies that the question was posed in that manner—and adds further that she only stated that her stepfather tickles her. It is clear by this exchange that her categorical objective while testifying was not to admit to any portion of her statement that would directly incriminate her stepfather. When she is then drilled concerning her understanding of telling the truth and lying, and specifically, when asked: "M, if I told you that telling the truth is a good thing and not telling the complete truth or telling a lie is a bad thing, would you agree with me if I said that? She sharply responds, "Depends on what your definition for a bad thing and a good thing is." The prosecutor then explains, "Let us consider for example that telling the truth is the right thing to do. Just for example. Whereas, not telling the complete truth, or telling a lie, is the wrong thing to do. If I phrased it that way, would you agree with me if I said that? She quickly lashes out, "I have been telling the truth. And every time I tell the truth I get—it just makes life hard." She had already explained some of her reservations about being open and answering questions concerning the sexual abuse in the beginning of direct examination. When asked whether anyone had ever given her a bad touch, she quickly verbally refuses to answer the question. The Court implores of her to answer the question, in response she confides, "Every time I answer a question I get reprimanded for doing it." The Court inquires, "Who is reprimanding you?" She replies, "Nobody, but I know it is already there." The Court continues to prod M: "Somebody is going to reprimand you if you answer truthfully?" She explains, "No. I know because, because of, because I see an outcome of my questions, the questions that I have to answer." The Court then asks what is the outcome. That is when she explains that her little sister can't sleep at

night, and that every time she looks at her baby brother she feels sad, and that her mother doesn't get any cases anymore.

Further, in response to questioning about the difference between a truth and a lie, she describes truth as telling something the way it happens and not covering it up, and that a lie is covering up the truth. After denying her statements for some time, she is then asked, "Did you ever tell your mother about your stepfather touching you?" She replies, "Yes." In court, she also admits that she told Hope and the officer, in response to the question whether she told anyone about what her stepfather did to her, that she had told her mother about it a year ago. Then when asked what her mother said or did in response to what she had told her about her stepfather, she denies what is written down on the statement—instead she states that her correct answer to Hope and the officer was that her mother had asked her stepfather to leave. A week later her mother had promised her she was going to tell M's father and that her mother had also talked about it to M's best friend's father who was a counselor. She was also (especially when initially asked) very reluctant to point out her stepfather in court, but eventually did at the end of direct examination.

K similarly manifested her reservations about testifying. Indeed—very early in her testimony—she broke down crying when asked whether she remembered ever having received a bad touch and vehemently refused to respond to the question. Upon inquiry of the Court, she affirmed that she believed something would happen if she were to respond to the question. She confided that if she were to respond she would be taken away from her mommy. She explained that a Mr. Williams Curtis told her that if she answered the question they would take her mommy away and put her in jail. She then admitted having undergone a physical examination by Dr. Matthew last year, and although she denied having made any statements concerning the sexual abuse to Dr. Matthew, she did admit that when she was questioned by Hope and the police officer at Clema Lewis' office that same day—that she had directly related to them that her stepfather Eugene Williams had touched her vagina by rubbing it up with his hands. (Transcript p. 137, lines 2-3, 14-20). She further admitted to having stated the following, in response to questions posed in Clema Lewis' office regarding whether she recalls when she was touched by Eugene Williams: "the first time he called me in the room. The second time is when he moved up to Mary's Fancy. And the third time we were still at

185

Mary's Fancy and he touched me with his penis." (Transcript p. 138-9, lines 1-23).

The girls first reported the sexual abuse to their mother who subsequently reported it to M's father on or about September 23, 2000.[2] Upon calling, the mother took the girls over to him to discuss the matter in more detail. On that visit both M and K spoke to M's father about the sexual abuse. M confided in her father that the abuse by her stepfather had been going on since the wedding and that she had been afraid to speak about it before. On that Saturday, their mother and M's father had agreed that on Monday, September 25, the girls would be taken to a doctor to confirm their allegations of abuse. Having not heard a word from their mother the entire day of September 25, M's father proceeded to call their mother to inquire about whether the girls had been taken to a doctor as had been agreed. The mother informed him that she had not taken the girls but that he should come over to her house the next day to discuss the matter further. When he went to the home (on the 26th of September) she explained to him that she was not up to taking them to a doctor just yet because she felt that if the doctor confirmed that the kids were molested she would flip. She also asked if he could at least wait until the family returned from a planned trip to Israel. When M's father left that day, he went home and called Human Services to report everything that had gone on with respect to the sexual abuse. He then called their mother to notify her of his call to Human Services. Following this, M called her father to inform him that he was required to go to Dr. Matthew's office in Princess the next day. On Wednesday, September 27, 2001 her father went to Dr. Matthew's office as directed, he recalls Clema Lewis, Officer Regisson-Willie, Hope Thornhill, M, K, and their mother being present that day.

Dr. Matthew was able to inquire of M concerning her medical history during the examination. During the examination, M (then 12 years old) identified the sexual perpetrator as her stepfather Eugene Williams, and related that the sexual contact had begun a couple days after her mother's wedding up until one year ago. She stated that it took place at her house

---

[2] While on the stand, the girls' mother invoked her Fifth Amendment Rights to Silence on advise of counsel because she was being charged for abuse and neglect on the same matter. The prosecution therefore called M's father to testify concerning the girls' initial reporting of the sexual abuse.

in Clifton Hill and Mary's Fancy when left alone with him. And at the time could not specify as to the frequency. K (then 9 years old) similarly spoke of the sexual abuse to Dr. Matthew: "My mom left me at home and Williams touched my private part." She explained that it occurred more than once. The exchange was limited because she was tearful, cowered with fear and withdrawn.

Upon conducting a rather thorough physical examination,[3] which included an anatomical examination of the patients' genitalia, Dr. Matthew found that the girls' hymens were not present. Their skin did not show any abnormalities, or bruises. She indicated that after making such initial observation—noting that there were visible signs of vaginal penetration—she proceeded to insert one digit (index finger) and then two digits in order to document the size and dilation of the vaginal area. Neither child was noted to exhibit any distress or discomfort during the digital examination. Dr. Matthew explained that the physical examination was consistent with the patient history presented by the girls, and that her diagnostic conclusions based on the medical findings was that the girls had been sexually molested.

After the physical examination, Hope Thornhill (Social Worker for the Department of Human Services) and Detective Valerie Regisson-Willis interviewed both M and K to record the details of the sexual abuse allegations against the defendant Eugene Williams. During the first set of questions M cried but managed to regain composure, she related that while living in Mary's Fancy her stepfather had come in bed with her under the sheets, and that he had put his penis in her vagina and that because it hurt she attempted to scream but that he covered her mouth with his hand. She told them that she told her mother about the sexual abuse about a year prior to the interview. During her interview, which took place at Clema Lewis' office, K expressed that Eugene Williams

---

[3] Their weight and height were recorded to be within normal limits. Their HNT—head, nose and throat were examined and found to be normal. Their neck, lungs, heart, abdomen were all normal. K had the normal external female genitalia in terms of anatomy. K's introitus was documented as enlarged, while M's was documented as patent and neither girl had a hymen present. There was no discharge and no abrasion. The rectal was normal tone. And although K's perineurium nerves were intact her behavior in terms of her emotional state was not as stable. She was crying, cowering with fear, and she was withdrawn.

had given her a bad touch by touching her vagina with his hands. She recalls three times and that it was while her mother would go to court. She remembers being touched while living at Clifton Hill. She stated that on one occasion he pulled her panty down a little bit and put his penis in her private part, and that when she screamed he took his hand and covered her mouth.

Subsequent to the interview of September 27, 2000, the girls were directed for counseling with Clema Lewis—a trained social worker[4] at The Women's Coalition. The sessions began in early October. They completed a total of four sessions before their mother discontinued the counseling. Clema Lewis explained that the first session was an icebreaker, so that the girls could feel comfortable with her. The second session did not take place until almost six weeks later because the girls had taken a planned trip to Israel with their mother. Because of the considerable lapse of time, the rapport process was reinitiated during this session to rekindle the girls' trust—they responded by openly talking about their trip to Israel. But they did intimate that they had spoken to the defendant while they were away. The third session took place sometime in December 2000, and that is when she began to ascertain what actually happened to them. The girls talked a little bit about what happened. M told her that Mr. Williams had inserted his penis in her vagina and that she told her mother. K's report was the same. They stated that to their recollection it happened over a year ago and that their mother had promised to protect them. M was exhibiting great anger because the defendant was still in their lives and she still had to call him dad. K exhibited great concern regarding her mother—she talked incessantly about her, expressing that her mother needed protection and elucidating that her mother was protecting them even though Mr. Williams was still around. But, according to the girls, the defendant was not in the house and they really didn't know where he was. Finally, during the fourth session the girls confided to Clema Lewis that the defendant was back in the house. When relating this information they were angry. At the session's conclusion—because their mother had left early that day—the

---

[4] Clema Lewis' testimony establishes that she is presently co-director and counseling supervisor of The Women's Coalition and that she has approximately two decades of experience in the field of counseling children—over the years she has developed special training in child abuse cases. (Transcript pp. 48-56).

188

counselor advised the girls to have their mother call her concerning this matter. Their mother never called, and instead terminated the counseling sessions.

## DISCUSSION

## MOTION FOR ACQUITTAL

### Standard of Review

■ The defendant's principle motion is one for acquittal. In reviewing a motion for judgment of acquittal the court must determine whether there was substantial evidence upon which a reasonable jury could have based its verdict, viewing the evidence in the light most favorable to the government and drawing reasonable inferences therefrom in the prosecution's favor. *United States v. Koeing,* 40 V.I. 440, 53 F. Supp. 2d 813 (D.C.V.I. 1999). Substantial evidence such as is required to sustain jury verdict of guilty is evidence that is adequate and sufficient to permit reasonable persons to find defendant's guilt beyond a reasonable doubt. *Government of the Virgin Islands v. Grant,* 21 V.I. 20 (D.C.V.I. 1984).

■ Defendant's main arguments are primarily based upon a mischaracterization of the evidence adduced at this trial. Firstly, the defendant's premise for surmising that the verdict was inconsistent and contrary to the weight of the evidence was that the jury's acquittal of the defendant on the counts of aggravated rape and rape in the first degree naturally signified that they fully accepted Dr. Carr's testimony which was sought to discredit the alleged child victims' complaints of sexual molestation. However, when considering the evidence in the light most favorable to the government, the fact that the jury found the defendant guilty of the child abuse counts against both K and M—which required as an element that the jury find that Defendant, Eugene Williams had had sexual intercourse with them—axiomatically means that the jury's reason for not finding guilt on the first two counts was not that they did not believe that the defendant had committed these sexual acts against K but that they could not find beyond a reasonable doubt (based on the evidence) that the acts of sexual intercourse occurred as charged—in the year 2000 and in the vicinity of 273 Mary's Fancy. Indeed, the evidence at trial seriously undermines the likelihood of defendant's theory. During the third counseling session with Clema Lewis (which was about December 2000) both girls stated that to their recollection the sexual

189

abuse happened over a year ago (which would have been at the very latest in 1999) and that the acts had occurred in both Clifton Hill and Mary's Fancy. From that evidence, the jury could have very plausibly concluded that they could not determine beyond a reasonable doubt whether the year 2000—as alleged in Counts I and 11—was in fact the year that the defendant had had sexual intercourse with K at their home in Mary's Fancy.

■ Secondly, the defendant's assertion that no evidence other than the impermissible hearsay testimony of Dr. Matthew, Hope Thornhill, and Clema Lewis was presented to support that any rape, molestation or abuse occurred is also inaccurate. To the contrary, the record reflects that Dr. Matthew, a local pediatrician conducted a physical examination of the girls on September 27, 2000 in order to treat them with respect to their complaints of sexual abuse, and that her findings were that the girls' hymens were absent. Moreover, in considering the evidence in the light most favorable to the government, the circumstances overwhelmingly corroborate that the girls underwent such examination. Both M and K testified that Dr. Matthew examined them and it is clear from all of the evidence that they personally informed her of their medical history, namely regarding their allegations of sexual abuse by Eugene Williams. Also, the evidence adduced supports that both of M's parents were present at Dr. Matthew's office during the examination, and that a social worker and police officer were also there.

On the other hand, it is very likely when considering the evidence in the light most favorable to the government that the jury essentially disregarded Dr. Carr's testimony. It is the defense's position that during its case in chief, it introduced evidence that Dr. Noel Carr had examined the girls on July 18, 2001 (a week prior to trial) and had found that the girls' hymens were intact and virginal, thereby refuting any possibility of sexual penetration. Yet, in considering this evidence in the light most favorable to the government there is insufficient evidence to corroborate that Dr. Noel Carr actually examined M and K, the victims in this case. This is so, because although M had responded affirmatively (on direct examination) to remembering having gone to see Dr. Noel Carr, "a man physician last week and being examined by him",[5] when she was asked

---

[5] These are Attorney Webster's verbatim words. (Transcript p. 87, lines 9-13)

only minutes later (on redirect), *when* it was she went to see Dr. Noel Carr, she responded quizzically stating, "I don't know what you talking about." (Transcript p. 88, Lines 15-20). Even though the defense (on recross)—in obviously attempting to rectify the inconsistency—again managed to have M agree that she did remember going to see Dr. Carr, the very leading questions required nothing more than a yes or no response. From this testimony, one can draw the reasonable inference that it is quite extraordinary that M did not have any real memory of the rather recent event,[6] and therefore that the identification of Dr. Carr by M was not credible. Furthermore, no other evidence (other than M's shaky admission) is presented to corroborate the visit to Dr. Carr's office a week prior to the trial. K was never asked whether Dr. Noel Carr had examined her, nor was their mother ever questioned about taking them to Dr. Carr. And more importantly, there is no evidentiary indication of what the girls might have stated to him during the medical history intake portion of the examination (or what their mother may have related to Dr. Carr, according to his testimony)[7] to corroborate Dr. Carr's findings concerning their complaints of sexual molestation. The introduction of such evidence could have explained why—even while knowing that the chief complaint of both girls was persistently sexual molestation—Dr. Carr entirely disregarded the basis for the alleged victims' complaints. Indeed, by openly admitting that his findings were limited solely to the gynecological evaluation, he suggested that he quickly dismissed the girls' complaints of sexual molestation once he found that the hymens were intact, without even exploring other potentially existing traces of the sexual abuse or the possible need for referring the girls to psychological counseling for a more accurate assessment of the basis for the complaints. Of critical importance, was Dr. Carr's response to the Court's question, "while keeping in mind the definition of sexual intercourse under the law—which is vaginal intercourse or any insertion, however slight, of hand, finger or object into the vagina, vulva, or

---

[6] This lapse of memory on the part of Michelle who had so vividly remembered details of the visit to Dr. Matthew's office a year ago appears critically dubious.

[7] Prior to examination, it was the mother, according to Dr. Carr's testimony, that gave the patient intake concerning the medical history of both girls. (Transcript p. 123, line 12-13).

labia—would it be fair to say that if this is the law, that someone could be guilty without the hymen being broken." From his response, one can draw the reasonable inference that Dr. Carr's position was fatally biased—Dr. Carr adamantly responded, "If there is vaginal intercourse the hymen is going to break." In so doing, he categorically ignored that he had already admitted that if somebody inserts a finger into the vulva or labia (which he explained was far removed from the hymen) the hymen would not break. (Transcript p. 120, lines 6-20) This inconsistency reasonably obscures the true relevance of Dr. Carr's expert testimony for purposes of reliably assessing whether the sexual abuse occurred in this case because it appears far too biased and one-sided. Dr. Carr's testimony's essentially purports that sexual molestation of a child can only be effected through vaginal penetration, which he equates as requiring some level of force. This testimony (when considered in the light most favorable to the government) completely shuns the nightmarish reality of sexual abuse of a minor by an adult member of the household in cases where the conduct may very well be limited to the slight insertion of a finger or object into the vulva or labia while remaining far removed from the hymen. Such conduct is expressly considered sexual intercourse pursuant to 14 V.I.C. § 1699. Under these circumstance, the jury may have reasonably deduced that Dr. Carr's testimony was far too defense-oriented to impart any valuable assistance to them with respect to determining the underlying facts of sexual abuse in this case, especially in light of the very telling testimony of the alleged victims themselves.

In addition, the defendant urges this court to find that M and K's out-of-court statements made on September 27, 2000 to Dr. Matthew during their physical examinations, to Hope Thornhill (social worker) and Detective Regisson-Willis, and those made to Clema Lewis during the four counseling sessions with the girls that followed the examination by Dr. Matthew (that took place between October and December 2000) were impermissible hearsay under the Federal Rules of Evidence.

In this regard, the defendant contends that the Court first erred by permitting the Government to use M and K's prior statements of September 27, 2000 made to Hope Thornhill and Detective Regisson-Willis to impeach their in-court testimony. However, the cases cited by the defendant fatally fail to support his position. For when this exact issue arose in *United States v. Dunford*, 148 F.3d 385, 392 (4th Cir.

192

1988), it was held that because the prior statements (made to several Government officials in a child abuse case) were admissible under the residual exception, use of the statements by the government to impeach the teenager victims' trial testimony (who had since recanted their statements) could not render such statements inadmissible. Indeed, with respect to the admissibility of the underlying September 27, 2000 prior statements (of the minor sexual abuse victims in this case) made to the social worker and police officer immediately following the physical examination that was used to impeach the girls' in-court testimony to the extent that they recanted their prior statements, this Court is similarly persuaded that the circumstances under which the statements were made impart the requisite indicia of reliability for admissibility under the residual exception, FED. R. EVID. 807.

The residual exception has long since been used to admit out of court statements in child sexual abuse cases. *See U.S. v. Shaw*, 824 F.2d 601, 609 (8th Cir. 1987) ("We have recognized that while Congress intended the residual hearsay exception to "be used very rarely, and only in exceptional circumstances," such circumstance generally exists when a child abuse victim relates to an adult the details of the abusive events") (internal citations omitted). Admissibility of out-of court statements under the residual exception require the following:

1) The statement must have the equivalent circumstantial guarantees of trustworthiness as the exceptions covered by FED. R. EVID. 803 and 804;

2) The statement must be offered as evidence of a material fact;

3) The statement must be more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts;

4) The general purposes of the Federal Rules of Evidence and the interests of justice will be served by admission of the statement into evidence;

5) The proponent of the statement must give the adverse party adequate notice.

Such statements must additionally possess "particularized guarantees of trustworthiness" for admission under the Confrontation Clause, which must be drawn from the totality of the circumstances that surround the making of the statement and that render the declarant particularly worthy of belief. Traditionally, the "firmly rooted" exceptions have been

recognized to possess such guarantees of trustworthiness without more; however, as regards the residual exception the proponent has the burden to show that this is indeed the case. *See Idaho v. Wright*, 110 S. Ct. 3139, 3146, 497 U.S. 805, 814 (1990). Although, acknowledging that there are several factors that courts have identified when assessing whether the out-of-court statements made by a child witness in child sexual abuse cases are reliable, the Supreme Court was reluctant to endorse a mechanical test for determining "particularized guarantees of trustworthiness" under the Confrontation Clause. *Id.* at 3150. The unifying principle, the court elucidates, is that these factors relate to **whether the child declarant was particularly likely to be telling the truth when the statement was made.** *Id.* (emphasis added). The Supreme Court did, however, patently convey that to be admissible under the Confrontation Clause hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness at the time the statements were made, and not by reference to other evidence at trial. *Id.*

In *Dunford* the district court summarily concluded that the serious nature of the repeated statements made by the children to government officials as well as the consistency of their stories given to those officials provided clear indicia of the trustworthiness of their statements. *Dunford* at 393. That court gave significant importance to the fact that one of the daughter's bruises corroborated the part of the story in which she stated that her father hit her. *Id.*

Likewise, in the case at bar, the government indicates that the circumstances surrounding the out-of-court statements made by M and K to the social worker and police officer following Dr. Matthew's examination of them contained strong indicia of reliability to rebut the presumption of untrustworthiness. Firstly, although both · girls were interviewed separately, they both gave very similar accounts. Of particular importance, was that the statements were made after having already been medically examined by Dr. Matthew who had medically observed that there were physical symptoms that corroborated the children's allegations of sexual molestation by their stepfather; and while the girls were fully aware that their mother, M's father, a police officer and social worker were present. These are rather serious circumstances that would intimidate the average child from actively fabricating such an elaborate lie for fear of the inevitable consequences of engaging in such

194

indiscretion. Indeed, the fact that the girls would relate incidents of sexual abuse by their stepfather to complete strangers (who work in the type of positions that would generally denote to the average child the need to behave with utmost respect and forthrightness), especially in light of the seriousness of the allegations against their stepfather— negates any possibility of untruthfulness. Moreover, the statements themselves were detailed and contained a typical child-victim's recollection of events. Finally, as the *Dunford* court also stressed, there is no evidence in the record to suggest that the sisters schemed[8] together to tell a consistent story. *Id* at 393. Hence, from the evidence surrounding the making of the statements to the social worker and police officer, the Court is convinced that M and K were particularly likely to be telling the truth.

Additionally, the Court finds that it is irrefutable that the statements were offered as material facts, *i.e.*, to prove the details as to how and when the defendant had sexually abused his stepdaughters. The Court also finds that the statements were more probative with respect to the extent of the detail contained in these statements that were absent in any other evidence admitted at trial, especially given that the children had later begun to recant essential components of their story (for fear of imparting irreparable harm to their mother who was being charged on child abuse and neglect). *See U.S. v. Shaw*, 824 F.2d 601, 610 (8th Cir. 1987) (in assessing the 'more probative' requirement the court stressed that the out-of-court statements contained specific details as to the dates of the incidents—details that the child sexual abuse victim could not provide at trial). In this regard, the admission of these statements was also important for the government to show—in light of the recanting— that the children had earlier made consistent series of accusations. *See United States v. Renville*, 779 F.2d 430, 440-441 (8th Cir. 1985) (in

---

[8] Note, that in *Dunford* the father argued that the daughters had made the statements as part of a scheme to get him in trouble after he would not let them date boys. The court points out that even though one of the daughters admitted that she had sometimes lied to get her father in trouble because he restricted her dating activity, she did not state that the gun story she told to the officers was a lie. On the contrary, she denied that she ever made the statements. Such a denial, the court states, seems inconsistent with the existence of the scheme alleged by Dunford. *Dunford* at 393.

admitting out-of-court statements made by an 11-year old victim of sexual abuse to a deputy sheriff—where (as in this case) the child had later recanted the allegations—the court placed great significance to the fact that the declarant had admitted in court that she had made the statements to the deputy sheriff (an appropriate individual), and the fact that the declarant had made almost identical statements accusing the defendant and describing the abuse to numerous state and medical personnel that had questioned her, and the foster parents with whom she was temporarily placed). Moreover, the Court—persuaded by the reasoning in *White v. Illinois*, 112 S. Ct. 736, 743 (1992)—finds that in admitting the statements, the general purpose of the Federal Rules of Evidence and the interests of justice are properly served. This is so, because the court is convinced that the out-of-court statements admitted in this case had substantial probative value, value that could not be duplicated simply by the declarant later testifying in court. (*See White v. Illinois* at 743 citing from *Coy v. Iowa*, 487 U.S. 1012, 1020, 108 S. Ct. 2798, 2802 (quoting *Kentucky v. Stincer*, 482 U.S. 730, 736, 107 S. Ct. 2658, 2662 (1987))). Therefore, to exclude such probative statements under the strictures of the Confrontation Clause would be the height of wrongheadedness, given that the Confrontation Clause has as a basic purpose the promotion of the 'integrity of the fact finding process.' *Id.*

The defendant also strenuously argues that the second set of out-of-court statements made by M and K to Dr. Matthew during the course of the examination were inadmissible hearsay. At trial this Court permitted the introduction of Dr. Matthew's testimony (regarding those statements) under the residual exception—finding that there were sufficient indicia of particular trustworthiness when the statements were uttered—essentially for the same reasons stated, *supra,* with respect to the statements made to the social worker and police officer. In closely reviewing the record, however, the Court has found that not only were there rather strong indicia of reliability underlying the making of these statements to Dr. Matthew, but that according to relevant precedent (and in retrospect) these circumstances fall pointedly under the more traditional medical diagnosis exception, FED. R. EVID. 803(4). (*See U.S. v. Balfany*, 965 F.2d 575, 581 (8th Cir. 1992) (discussing the admissibility of statements made be a child sexual abuse victim to a physician, including identification of the abuser) ("Not only do we believe that the hearsay was admissible, we believe the district court did

not need to resort to the residual exception to the hearsay rule."). Therefore, the Court will proceed to analyze the statements under Rule 803(4).

In this jurisdiction, the issue was recently addressed in *Government of the Virgin Islands v. Morris*, 191 F.R.D. 82, 85 (D.V.I. 1999). The district court admitted the out-of-court statements made by a minor (despite the victim's young age) who subsequent to having reported an incident of sexual abuse to her aunt, was medically examined by a physician and nurse at the hospital's emergency room. In admitting the child abuse victim's statements to the doctor, the district court reasoned that the doctor's testimony sufficiently established that the type of information gathered during the examination was relevant, routinely obtained in child sexual abuse cases and relied upon for treatment and diagnosis. *Morris* at 86. In *Morris,* the district court also carefully distinguished the appellate court's decision in *U.S. v. White*, 11 F.3d 1446, 1449 (1980) (which had declined to find that out-of-court statements made to a physician by a four-year old child concerning the sexual abuse were admissible under the medical diagnosis exception, Rule 804(3)). It noted that in *White,* the court had specifically emphasized facts such as the non-medical location and circumstances of the interview which did not support an inference that the child was aware that he was seeking medical treatment or that he was even talking with a medical professional. *Morris* at 86.

As *Morris* recapitulates, generally statements made by a declarant during the course of seeking medical treatment or diagnosis may be admitted as an exception to the general proscription against third-party statements. *Id.* at 85. FED. R. EVID. 803(4), 802. These statements are presumed reliable on the premise that there is a great motivation to be truthful when a declarant is aware of the need for proper treatment and diagnosis. *Id. See* FED. R. EVID. 803(4) advisory committee's note; *White v. Illinois*, 502 U.S. 346, 355, 112 S. Ct. 736, 743 (1992) ("a statement made in the course of procuring medical services, where the declarant knows that a false statement may cause misdiagnosis or mistreatment, carries special guarantees of credibility that a trier of fact may not think replicated by courtroom testimony."). Thus, the threshold inquiry in admitting such statements is whether they were "reasonably pertinent" to diagnosis or treatment. *Morris* at 86. A two-pronged test is applied to determine the statements' admissibility:

(1) The declarant's motive in making the statement must be consistent with the purposes of promoting treatment; and

(2) The content of the statement must be such as is reasonably relied on by a physician in treatment or diagnosis.

*Id.*

Of great significance in this case is that having reported to their mother the sexual abuse by their stepfather—both M and K—were keenly aware that they had been taken to Dr. Matthew's office to be examined for purposes of diagnosing whether they had been sexually molested. On that visit, the children related to Dr. Matthew that their stepfather had touched them sexually, both girls indicated that the incidents took place at their home (in Clifton Hill and Mary's Fancy) while their mother was absent. The content of these statements singularly demonstrates that they were expressed in order to explain to Dr. Matthew the nature of the complaint for which they were seeking medical assistance. Dr. Matthew, who testified as being experienced in the handling of child sexual abuse cases, also clarified that the abuser's name and relationship to the patient is important for purposes of documenting the detailed history of the sexual complaint in order to properly diagnose the sexual abuse. Under these circumstances, it is clear that the information given by M and K to Dr. Matthew was not only important for diagnosis and reasonably necessary to prescribe the course of treatment regarding their complaints of sexual molestation by their stepfather, but, therefore, also obviously indicative of the statements' strong inherent reliability under FED. R. EVID. 804(3).

The statements of M and K made to Clema Lewis during the four counseling sessions following the visit to Dr. Matthew similarly fall under the medical diagnosis exception, FED. R. EVID. 804(3). For courts have also established that statements about abuse, including the identity of the abuser, made by a child to a trained social worker or psychologist pursuant to diagnosis or treatment for emotional or psychological injuries are admissible under Rule 803(4). *U.S. v. Balfany*, 965 F.2d 575, 581 (8th Cir. 1992); *cf. White*, 112 S. Ct. at 743-44 (confrontation clause does not preclude admission of child's out-of-court statements under "firmly rooted" hearsay exception for medical treatment). This Court firmly agrees.

The evidence adduced at trial demonstrates that based upon Dr. Matthew's examination of M and K and her diagnosis that the children had been sexually molested, they were directed for counseling treatment with Clema Lewis who was established as a trained social worker and certified counselor. It is apparent from the applicable case law that the information she had acquired from the children—the details of the incidents of abuse, including the identity of the abuser, the frequency of the abuse, the times, and places where the abuse took place, and whether the abuser was still in close proximity of them—were pertinent to treatment of their emotional and psychological injuries. *Balfany* at 581. Especially, in this case, where the safety of the children depended upon their candidness about the defendant's direct presence in their lives.

More importantly, the defense completely undermines the relevance of the in-court statements made by both M and K during their testimony at trial—neither girl (and in particular K) ever absolutely denies the allegations of sexual abuse while on the stand. Their in-court statements standing alone, if considered in the light most favorable to the prosecution, themselves generate substantial evidentiary support for the jury's verdict. Indeed, the fact that they were available for cross-examination vitiates the obstacles often imposed by the Confrontation Clause. Pointedly, the Supreme Court has recognized a partial overlap between the requirements of the traditional hearsay rule and the Confrontation Clause. *U.S. v. Owens*, 108 S. Ct. 838, 843 (1988); *See also California v. Green*, 399 U.S. 149, 157-164, 90 S. Ct. 1930, 1934-38 (1970). Such that, when a hearsay declarant is present in trial and subject to unrestricted cross-examination, the traditional protections of the oath, cross-examination, and opportunity for the jury to observe the witness' demeanor satisfy the constitutional requirements. *Id.* There is no question that the defendant was given ample opportunity to cross-examine M and K, and develop his theory that the girls had made up the story against the defendant. The jury was able to observe their demeanor while denying certain aspects of their prior out-of-court statements, and even while they intermittently admitted to statements that tended to incriminate the defendant. The testimony without a doubt established their concern for their mother and the looming separation of their family were they to openly admit that the defendant had sexually abused them. Based upon these circumstances, the jury could have reasonably inferred from their behavior that their complaints of sexual abuse were credible.

In summary, the Court finds that the contested admissions of the out-of-court statements were proper under the circumstances, and that the defendant's constitutional rights under the 6th Amendment Confrontation Clause were, therefore, sufficiently protected. Hence, the defendant's request for acquittal must be denied.

## MOTION FOR NEW TRIAL

### Standard of Review

In the alternative, the defendant requested this Court to grant a new trial. The court may grant a new trial "in the interest of justice" and in assessing such "interest", the court may weigh the evidence and the credibility of witnesses, and if the court determines that there has been a miscarriage of justice, the court may order a new trial. *See United States v. Bevans*, 728 F. Supp. 340, 343 (E.D. Pa. 1990). *United States v. Charles*, 35 V.I. 306, 949 F. Supp. 365 (D.C.V.I. 1996). The court must grant a new trial if trial error had a substantial influence on the verdict. *Government of the Virgin Islands v. Commission*, 706 F. Supp. 1172 (D.C.V.I. 1989). Accordingly, it is only if the evidence preponderates heavily against the verdict, that the court will, in an exercise of discretion, order a new trial. *Government of the Virgin Islands v. Grant*, 19 V.I. 440 (Terr. Ct. St. C. 1983).

Having weighed the evidence, the Court is likewise convinced that it substantially supports the verdict, and, therefore, cannot find that the evidence preponderates on the favor of Defendant to warrant the granting of a new trial. Thus, the defendant's request for a new trial must also be denied.